Lea Ann LINDER, Carolyn Greene, and Cleta Johnson *v.* Bill LINDER and Mildred Sims

01-380 72 S.W.3d 841

Supreme Court of Arkansas
Opinion delivered April 25, 2002

*Joel W. Price*, for appellants.

*Ronald W. Metcalf, P.A.*, by: *Ronald W. Metcalf*, for appellees.

*Mark Pryor*, Att'y Gen., by: *Melanie Winslow*, Ass't Att'y Gen., for intervenor.

ROBERT L. BROWN, Justice. This is a grandparent visitation-rights case. At issue is the constitutionality of the Arkansas Grandparental Visitation Act, codified at Ark. Code Ann. § 9-13-103 (Repl. 2002) (GPVA). There are three appellants in this matter: Lea Ann Linder, mother of Brandon Linder, the minor child around whom this litigation revolves; Cleta Johnson, Lea Ann's mother; and Carolyn Greene, Lea Ann's sister.[1] The appellees are Bill Linder, Brandon's paternal grandfather, and Mildred Sims, Brandon's paternal grandmother. Bill Linder and Mildred Sims were granted visitation with Brandon by the trial court. Lea Ann now appeals this grant of visitation. The State of Arkansas has intervened to defend the constitutionality of the GPVA.

On April 24, 1992, Lea Ann Linder married Steven Linder. They had one child, Brandon, who was born on November 17, 1995. Steven, Lea Ann, and Brandon lived near Alma and close to Bill Linder, Steven's father. Bill and Steven's mother, Mildred Sims, had divorced some years earlier. Bill was remarried to Donna Linder. Bill and Donna had two children, Nikki and Stacey. Steven worked with Bill on a daily basis, and Bill saw Brandon on a regular basis.

On November 11, 1997, just before Brandon's second birthday, Steven Linder was killed in a four-wheel all-terrain vehicle accident while he was hunting. In the immediate aftermath of Steven's death, Lea Ann and Brandon spent Brandon's birthday, part of Thanksgiving, and part of the Christmas Eve holiday with Bill and Donna Linder. During this time, Bill saw Brandon on a fairly regular basis, though less than when Steven was alive.

---

[1] The three appellants will be referred to collectively in this opinion as Lea Ann.

For about four months after Steven's death, Lea Ann and Brandon remained in the house in which they had all lived, which was in close proximity to Bill's home. According to Lea Ann, she did not feel comfortable living in the house, and she and Brandon moved into a duplex in nearby Van Buren. Lea Ann got a job and put Brandon in day care. While they lived in Van Buren, Lea Ann told Bill that he could see Brandon if he came to their home. He did not do so. In 1998, Lea Ann and Bill had arrangements to spend part of the Easter holiday together, but those plans fell through when Lea Ann called Bill and canceled due to a conflict.

In the late spring of 1998, relations between Bill and Lea Ann became more strained. At the end of May, Lea Ann moved to a house in Fort Smith. Soon thereafter, on June 11, 1998, Bill contacted Lea Ann and specifically requested to see Brandon. The two were unable to work out a mutually convenient time for the visit. On June 24, 1998, Bill Linder filed a petition for visitation in the Sebastian County Chancery Court.

In the visitation petition, Bill alleged that he had a close and loving relationship with Brandon, and that Lea Ann was unreasonably denying him access to his grandson. He proceeded in his petition under Ark. Code Ann. § 9-13-101 (Repl. 2002), Arkansas's general custody statute and asserted that that statute, which provided for grandparental *custody*, gave the chancery court the implied power to grant grandparental *visitation*. The petition did not invoke rights under the GPVA. Nor did the petition assert that Brandon would suffer harm if he did not see his grandfather, or that Lea Ann Linder was an unfit mother.

The parties began the discovery process. Lea Ann was deposed, and in her deposition, she asserted that she did not want Bill to have as much visitation as he wanted, but that she would agree to limited visitation. She stated, as her reason for limiting the visitation, that Bill and Steven's mother, Mildred Sims, were locked in a power struggle over family members' loyalties. She further stated that Steven, during his life, had always had problems with his father, and that she did not want Brandon to have the same problems. She also stated that Steven had confided in her that

he did not enjoy working with his father, and that his father was a source of emotional anguish to him.

After the deposition, Bill moved for temporary visitation, alleging that discovery could take some time and that he should be allowed to see Brandon during the interim period. On August 5, 1998, the trial court entered a temporary visitation order pending a hearing on the petition. The order, entered on August 10, 1998, granted Bill temporary visitation. In its order, the trial court required Lea Ann to allow Bill to see Brandon according to the Twelfth Judicial District's standard visitation order and allowed limited weekend visitation with Brandon.

On August 13, 1998, Lea Ann filed a motion to set aside the temporary order and requested an emergency hearing. She attached several letters from medical professionals and friends expressing the opinion that Brandon should not be separated from his mother during his time of loss and confusion about his father's death. During the pendency of her motion to set aside, Lea Ann did not allow Bill to see Brandon, contrary to the trial court's temporary order. Bill filed a motion to show cause on why she should not be held in contempt of court.

On August 27, 1998, the chancellor held a hearing on the temporary order and on Bill's motion for contempt. After hearing the testimony of several witnesses for both sides, including Lea Ann and Bill, the trial court ruled from the bench that it was in Brandon's best interests to grant Bill's petition for visitation. In its order, the trial court allowed Bill visitation every other weekend. The court also found Lea Ann to be in contempt of court but did not impose a sanction. The trial court's order was not filed until September 2, 1998.

On August 31, 1998, Bill filed another motion for contempt due to Lea Ann's failure to comply with the trial court's August 27 bench ruling. On September 2, 1998, another contempt hearing was held. Again, the chancellor found Lea Ann to be in contempt of court but did not sanction her. After this hearing, Lea Ann allowed Bill two visits with Brandon as ordered by the court. This was the first time Bill had seen Brandon since February 1998. Lea Ann, however, did not allow a third visit, because she stated

that Brandon had a fever and was too ill to visit. In response, Bill filed his third motion for contempt on September 22, 1998.

On September 25, 1998, Lea Ann filed a Notice of Appeal from the September 2, 1998 order but did not pursue this appeal and never lodged a record in the matter.

On October 6, 1998, Bill's counsel wrote a letter to the trial court in which he averred that on October 3, 1998, Bill picked up Brandon from Lea Ann's house for an overnight visit. According to the letter, there were several irregularities with this visit. First, Lea Ann's sister, Carolyn, was present at the pick-up and, as was apparently her custom, she videotaped the pick-up. Second, Lea Ann called to check on Brandon nine times during the visit. Third, Lea Ann appeared uninvited and unannounced twice during the visit: first in the parking lot of the county fair, and then at Bill's home at midnight. Subsequent to this overnight visit, the trial court warned the parties to cooperate.

Contrary to the trial court's letter and prior orders, Lea Ann did not make Brandon available for his next visitation. On October 12, 1998, Bill filed a fourth motion for contempt. On October 15, 1998, the trial court held an emergency hearing on this motion. Lea Ann did not appear at the hearing and had fled the jurisdiction, taking Brandon with her. On October 22, 1998, the trial court found Lea Ann in contempt of court and issued a warrant for her arrest. On October 26, 1998, Bill moved for temporary custody of Brandon. The same day, the court granted Bill's motion *ex parte* and awarded Bill temporary custody of Brandon.

Lea Ann's and Brandon's whereabouts remained unknown for a year, despite the efforts of local, state, and federal law enforcement officers. After months of attempting to locate the two, Bill joined Cleta Johnson (Lea Ann's mother) and Carolyn Greene (Lea Ann's sister) in his visitation action. He then deposed them regarding Lea Ann's and Brandon's location. Both women refused to disclose the information and invoked their Fifth Amendment protection against self-incrimination on the advice of counsel.

On October 14, 1999, Bill moved to hold Cleta and Carolyn in contempt of court for their refusal to disclose Lea Ann's location. On October 18, 1999, the trial court ordered them jailed for contempt and conditioned their release on Lea Ann's surrendering herself to the court. That same day, Cleta and Carolyn told the court that Lea Ann and Brandon were living in Columbus, Ohio.

While living in Ohio, Lea Ann had married a man named Wes Carlisle. Ohio law enforcement authorities located Lea Ann and Brandon in Columbus, and Lea Ann surrendered herself to the court that evening. Cleta and Carolyn were released from jail the next day, and Lea Ann was placed in jail until the trial court released her on October 25, 1999. Brandon was delivered to Bill under the trial court's custody order. On October 28, 1999, Lea Ann moved to have custody of Brandon restored to her because she was now back in the jurisdiction of the trial court. The motion further alleged that while in Bill's custody, Brandon was attacked by a dog and suffered lacerations on his face. There is nothing in the record before us to indicate that the trial court took any action on her motion.

On November 4, 1999, Bill moved that all parties to the litigation undergo psychological evaluations. He specifically requested that Dr. Mary "Guen" Wright, a forensic psychologist, be appointed by the trial court for this task. Lea Ann objected to Dr. Wright's performing the requested evaluations because Bill had already hired her to counsel Brandon. On November 8, 1999, the court granted Bill's motion over Lea Ann's objections. Psychological evaluations of all involved parties commenced.

On the weekend of December 10, 1999, Lea Ann had visitation with Brandon, who was still in Bill's custody. As part of her visitation, she took Brandon to Ohio to see her husband and Brandon's step-father. This out-of-state trip violated the terms of the trial court's visitation order, according to Bill's December 20, 1999 Motion for Performance Bond. The motion sought to require Lea Ann to post a bond to fund Bill's efforts to find Brandon and her if she again fled the jurisdiction.

On December 16, 1999, Lea Ann again moved the trial court to return Brandon to her custody, but the court took no action on

this motion. During the months of December 1999, and January and February 2000, a volley of correspondence to the trial court ensued in which Bill and Lea Ann, through counsel, disputed the details of Bill's custody and Lea Ann's visitation. The trial court did not respond to this correspondence. During this time, the psychological evaluations were ongoing.

On February 16, 2000, Mildred Sims intervened in the action in an attempt to obtain the right to visit Brandon under the GPVA. She had seen Brandon sporadically during Bill's custody in the latter months of 1999 and early 2000. In her motion, she alleged that Lea Ann had not made contact with her about Brandon, and that it would be in Brandon's best interest to have a relationship with his paternal grandmother.

On February 22 and 24, 2000, Lea Ann's counsel submitted two extensive motions and memoranda of law requesting that the GPVA be declared unconstitutional and that custody of Brandon be restored to her. She also moved to exclude the reports and testimony of Dr. Wright because she had been hired by Bill before the trial court ever appointed her. She noted that it was Bill who recommended Dr. Wright to the court. The trial court denied the motion to exclude.

On March 6, 2000, the trial court began a lengthy final hearing in this matter. This hearing continued on March 8, 2000, and on March 27-30, 2000. Dr. Guen Wright testified extensively at this hearing over Lea Ann's objections. Dr. Wright prepared and submitted to the court a sixty-page report detailing her psychological evaluations of Lea Ann, Brandon, Wes Carlisle, Bill, Donna, Cleta, and Carolyn.

The crux of Dr. Wright's testimony was that Lea Ann suffered from two psychological disorders. First, Dr. Wright opined that Lea Ann suffered from a psychological disorder known as shared psychotic disorder, or *folie à deux*.[2] *Folie à deux* is a disorder which occurs when a diagnosed person is so closely connected with and bonded to another person (called the inducer) that the psychosis of the inducer is adopted by the diagnosed person. In

---

[2] *Folie à deux* literally is translated from French to mean "a shared madness of two."

this case, Dr. Wright opined that Lea Ann had adopted the persecutory-delusional psychosis of her mother, Cleta Johnson, whom Dr. Wright identified as the inducer. This was Dr. Wright's first diagnosis of *folie à deux* in her career. On cross-examination, Dr. Wright opined that Cleta and Lea Ann were able to maintain the extraordinarily close relationship required for *folie à deux* through telephone calls.

Dr. Wright also diagnosed Lea Ann with narcissistic personality disorder, which is characterized primarily by an inflated and unrealistic sense of one's own self-worth. Dr. Wright did not diagnose any other adult as having psychological disorders, although she did diagnose Brandon with three disorders.

In addition to Dr. Wright's testimony, Bill testified. He also presented the testimony of Cleta regarding her relationship with her daughter, and Sebastian County Sheriff's Department warrant officer John Mendenhall, who was involved in the year-long effort to locate Lea Ann in 1998-1999. Lea Ann presented the testimony of Wes Carlisle's mother, Beverly Carlisle, as well as the testimony of Drs. Donald Chambers, Patricia Walz, and Richard Aclin. Dr. Chambers vigorously disputed Dr. Wright's diagnosis of *folie à deux*.

After the conclusion of the testimony, the trial court made a partial bench ruling. The court declined to hold the GPVA unconstitutional. At the beginning of the final hearing held on March 6, 2000, the trial court first stated that position when it said from the bench that this trial court did not rule acts of the legislature unconstitutional. At the conclusion of the testimony the trial court reiterated its prior statement when it made the following ruling:

> I am going to overrule Mr. Price's motion to declare the Arkansas statute unconstitutional. I'll let some other forum address that, but I'm not. I find it to be without merit, and I'm overruling it.

The court gave Lea Ann custody of Brandon and allowed Bill and Mildred the standard visitation associated with noncustodial parents. He required that Lea Ann post a $20,000 bond as assurance that she would permit the visitation.

There were several post-hearing pleadings filed by the parties involved. Specifically, on March 24, 2000, Lea Ann moved to strike Dr. Wright's testimony. On June 8, 2000, Lea Ann renewed her motion to have the GPVA declared unconstitutional in light of the United States Supreme Court's opinion in *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion), which was handed down on June 5, 2000 and which declared Washington state's GPVA unconstitutional as applied.

On June 26, 2000, the State of Arkansas intervened in this matter and filed a brief in the trial court. The State urged the court to find Arkansas's GPVA constitutional under *Troxel v. Granville, supra.*

In mid-July, 2000, Lea Ann was offered a job transfer to New York within her company, Renaissance Imports, which is a shoe-import outfit operating in New York state. The transfer offered salary and benefits comparable to her job in Arkansas. She requested that the trial court allow her to accept the transfer and move, with Brandon, to New York.

On August 9, 2000, the trial court entered an order formally deciding the outcome of the custody/visitation hearing as well as the other post-hearing matters pending before it. The order declared the Arkansas GPVA to be constitutional as applied and on its face. The order awarded custody of Brandon to Lea Ann and found her to be a fit mother. However, the trial court denied Lea Ann's request to move to New York and required the posting of a $20,000 bond assuring the court that she would not flee the jurisdiction and that she would allow the visitation that Bill was awarded in conformity with the court's standard order. Bill was permitted weekend visitation and Wednesday night visitation. Mildred Sims was assigned Bill's visitation on the first weekend of each month.

Lea Ann now appeals from this order, as do Cleta Johnson and Carolyn Greene. She urges this court to declare GPVA unconstitutional. She also challenges a number of other rulings made by the trial court, which we do not reach as we reverse and dismiss on her first issue raised.

## I. Motion to dismiss and strike

As an initial point, appellees Bill Linder and Mildred Sims move to dismiss the 1998 appeal in this case. This prior appeal consisted solely of a Notice of Appeal filed by Lea Ann on September 25, 1998, and was not pursued, as Lea Ann fled the jurisdiction some twenty days later. As a result, the appellees argue that the constitutionality of the GPVA and Bill's visitation have become law of the case or, alternatively, that the doctrine of *res judicata* applies. The appellees ask this court to dismiss the 1998 notice of appeal and to strike those portions of Lea Ann's brief which challenge the constitutionality of the GPVA and the trial court's visitation order.

■ With respect to law of the case, we note that there was no previous opinion by an appellate court in this state. This court recently observed that the doctrine applied when there had been a previous appellate opinion in the case. *See Cadillac Cowboy v. Jackson*, 347 Ark. 963, 69 S.W.3d 383 (2002). In *Cadillac Cowboy*, we said:

> The venerable doctrine of law of the case prohibits a court from reconsidering issues of law and fact that have already been decided on appeal. The doctrine serves to effectuate efficiency and finality in the judicial process. *Frazier v. Fortenberry*, 5 Ark. 200 (1843); *see also*, 5 AM.JUR.2d *Appellate Review* § 605 (1995). We have said the following with regard to the law-of-the-case doctrine:
>
> > The doctrine provides that a decision of an appellate court establishes the law of the case for the trial upon remand and for the appellate court itself upon subsequent review. *Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998). On the second appeal, the decision of the first appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not, presented. *Griffin v. First Nat'l Bank*, 318 Ark. 848, 888 S.W.2d 306 (1994).
>
> *Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 346, 47 S.W.3d 227, 237 (2001).

*Cadillac Cowboy v. Jackson*, 347 Ark. at 970, 69 S.W.3d at 388.

■ ■ It is true that under our doctrine of law of the case, we do not address in a second appeal issues that could have been raised in the first appeal, but were not. *Chambers v. Stern*, 347 Ark. 395, 64 S.W.3d 737 (2002) (citing *McDonalds Corp. v. Hawkins*, 319 Ark. 1, 888 S.W.2d 649 (1994); *Alexander v. Chapman*, 299 Ark. 126, 771 S.W.2d 744 (1989)). As we said in *Morris v. Garmon*, 291 Ark. 67, 68-69, 722 S.W.2d 571, 573 (1987): "On second appeal, as in this case, the decision on the first appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not, presented." However, it is equally clear from our cases that it is this court's *opinion* in a prior appeal which becomes law of the case, not the mere filing of a notice of appeal. *See, e.g., Ghehan v. Ghehan v. Barclay*, 345 Ark. 514, 49 S.W.3d 652 (2001) ("[T]he decision on the first appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former appeal."); *Morris v. Garmon, supra* ("[T]he decision on the first appeal becomes the law of the case[.]") There was no decision in a previous appeal in the case before us. We conclude that a motion to dismiss this matter due to law of the case has no merit.

■ With respect to *res judicata*, it is true that the doctrine bars the relitigation of claims that were actually litigated in the first suit as well as those that could have been litigated. *Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 59 S.W.3d 438 (2001); *Well v. Arkansas Pub. Serv. Comm'n*, 272 Ark. 481, 616 S.W.2d 718 (1981). Thus, where a case is based on the same events as the subject matter of a previous lawsuit, *res judicata* will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies. *Willis, supra; Swofford v. Swofford*, 295 Ark. 433, 748 S.W2d 660 (1988). The policy of the doctrine is to prevent parties from relitigating issues or raising new issues when they have already been given a fair trial. *Willis, supra; McCormac v. McCormac*, 304 Ark. 89, 799 S.W.2d 806 (1990).

■ Custody matters, however, are different when the doctrine of *res judicata* is called into play. When the matter is a custody issue, our court takes a more flexible approach to *res judicata*. We recognize, for example, that custody orders are subject to modifi-

cation in order to respond to changed circumstances and the best interest of the child. *Mood v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999); *Thurston v. Pinkstaff*, 292 Ark. 385, 730 S.W.2d 239 (1987). For example, in *Tucker v. Tucker*, 195 Ark. 632, 636, 113 S.W.2d 508, 508 (1938), we said;

> The judgment of a chancery court in this state, awarding the custody of an infant child to one of the parents, or to any other person, is a final judgment, from which an appeal lies, but it is not res judicata in the same or another court of this state involving the custody of the same child, where it is shown that the conditions under which the former decree was made have changed and that the best interest of said child demand a reconsideration of said order or decree.

■ In the case at hand, what has been involved since 1998 has been Bill Linder's petition for visitation and, since 1999, the custody of Brandon. Secondly, the constitutionality of the GPVA was not an issue in the litigation that preceded the September 2, 1998 order. Indeed, it was not raised until Mildred Sim's petition in 1999. *Troxel v. Granville, supra,* which has become the seminal case, was not handed down by the United States Supreme Court until 2000. *Res judicata* simply does not govern this situation.

■ We deny the appellees' motion to dismiss and strike.

## II. · Constitutionality of the GPVA

For her first point on appeal, Lea Ann contends that the GPVA, under which Bill was awarded visitation, is unconstitutional, both facially and as applied. She bases her argument on her Fourteenth Amendment liberty interest in parenting her child without undue interference from the state, as recently addressed by the United States Supreme Court in *Troxel v. Granville, supra.*

Arkansas's GPVA provides:

> (a)(1) Upon petition by a person properly before it, a circuit court of this state may grant grandparents and great-grandparents reasonable visitation rights with respect to their grandchild or grandchildren or great-grandchild or great-grandchildren at any time if:

(A) The marital relationship between the parents of the child has been severed by death, divorce, or legal separation; or

(B) The child is in the custody or under the guardianship of a person other than one (1) or both of his or her natural or adoptive parents; or

(C) The child is illegitimate, and the person is a maternal grandparent of the illegitimate child; or

(D) The child is illegitimate, and the person is a paternal grandparent of the illegitimate child, and paternity has been established by a court of competent jurisdiction.

(2) The visitation rights may only be granted when the court determines that such an order would be in the best interest and welfare of the minor.

(3)(A) An order denying visitation rights to grandparents and great- grandparents shall be in writing and shall state the reasons for denial.

(B) An order denying visitation rights is a final order for purposes of appeal.

(b) If the court denies the petition requesting grandparent visitation rights and determines that the petition for grandparent visitation rights is not well-founded, was filed with malicious intent or purpose, or is not in the best interest and welfare of the child, the court may, upon motion of the respondent, order the petitioner to pay reasonable attorney's fees and court costs to the attorney of the respondent, after taking into consideration the financial ability of the petitioner and the circumstances involved.

(c) The provisions of subsections (a) and (b) of this section shall only be applicable in situations:

(1) In which there is a severed marital relationship between the parents of the natural or adoptive children by either death, divorce, or legal separation; or

(2) In which the child is in the custody or under the guardianship of a person other than one (1) or both of his or her natural or adoptive parents; or

(3) If the child is illegitimate.

Ark. Code Ann. § 9-13-103 (Repl. 2002).

a. Fundamental right to parent.

 The Fourteenth Amendment provides in relevant part that "[No state shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. This language has been interpreted over the years to have both a procedural and substantive component. The substantive component of the due process clause protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997).

 One of the substantive components that has emerged from the Fourteenth Amendment's guarantee of due process of law is the liberty right of a parent to have and raise children. Several cases from the United States Supreme Court have dealt with the contours of this right as it has emerged over recent decades. In *Troxel v. Granville, supra,* Justice O'Connor, speaking for four Justices in a plurality decision, summarized the Court's approach to governmental intrusions on the parent-child relationship:

> [T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters,* 268 U.S. 510, 534-535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.,* at 535, 45 S. Ct. 571. We returned to the subject in *Prince v. Massachusetts,* 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of

parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166, 64 S. Ct. 438.

In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. . . . In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

*Troxel*, 530 U.S. at 65–66.

■ Thus, a parent has a liberty interest, for example, in shaping a child's education. *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (invalidating Wisconsin statute purporting to require Amish children to attend public school, against the wishes of the parents). A parent also has a right to direct the care and upbringing of a child. *Prince v. Massachusetts*, *supra* (affirming application of a child-labor law to the parent of a child distributing religious tracts). Accordingly, a fit parent is given a presumption that he or she is acting in a child's best interests. *Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("[N]atural bonds of affection lead parents to act in the best interests of their children."). The parental rights protected by the Fourteenth Amendment do not spring from a bare biological connection to a child, but rather must be born of a relationship to a child demonstrated over time. *Michael H. v. Gerald D.*, 491 U.S. 110 (1989).

b. *Troxel v. Granville*

In *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion), the United States Supreme Court wrestled with the balance between state statutes granting grandparents the right to petition for visitation rights against a parent's Fourteenth-Amendment due-process liberty interest in parenting a child without undue state interference. The Washington State statute involved in *Troxel* was considerably broader than the Arkansas statute at issue in the instant case, as it allowed *any person* the right to petition for visita-

tion *at any time*. In *Troxel*, the two children at issue were born to unwed parents, and the father later committed suicide. Before the father's death, the paternal grandparents saw the two children frequently. However, after the father's death, the visits became less regular. The grandparents petitioned for additional visitation time. The mother agreed to some visitation but balked at giving as much visitation as the grandparents wanted.

The Washington Supreme Court declared the Washington statute to be facially invalid due to its breadth. *See In re Smith*, 137 Wash. 2d 1, 969 P.2d 21 (1998). The Washington Supreme Court first determined that strict scrutiny should apply to any intrusion on the parent's Fourteenth Amendment, fundamental interest in parenting the child without state intrusion. The court then identified possible compelling state interests that might offset the parent's fundamental interest, each of which was predicated on harm or threat of harm to a child. Only in the event of harm, the court reasoned, would the State be justified in intruding upon a parent-child relationship by ordering nonparental visitation against the parent's will. The Washington court concluded that a statute that allowed *any* person to petition for visitation under *any* circumstances was not justified by a compelling interest.

The United States Supreme Court granted *certiorari* and affirmed, but took a different tack in the case. In the resulting opinions, all but one justice agreed that the Fourteenth Amendment provided a liberty interest for parents to be free from intrusion by government when making decisions regarding the rearing of children. Instead of addressing the facial challenge to the statute, as the Washington court had done, Justice O'Connor, writing for four justices, addressed only the application of the statute and held that the Washington statute was unconstitutional as applied.

██ ██ Justice O'Connor's analysis began by characterizing the Washington statute as "breathtakingly broad." *Troxel*, 530 U.S. at 67. She then focused on the central problem with the statute: It fails to accord a fit parent's wishes any weight whatsoever. The statute, in employing only the best-interest-of-the-child standard, failed to recognize the fit parent's interest in deciding what is in a child's best interest. The only guidance offered by Justice

O'Connor as to the scope of the "fitness" determination is her statement that "so long as a parent *adequately cares for his or her children* (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id*. at 68-69 (emphasis added). She then observed:

> [The statute] contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest [of the child] determination solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests.
>
> . . .
>
> The Superior Court's order was not founded on any *special factors* that might *justify* the State's interference with Granville's fundamental right to make decisions concerning the rearing of her two daughters.

*Troxel*, 530 U.S. at 67-68 (emphasis added).

Justice O'Connor went on to note that impingement on a parent's fundamental liberty right to raise children requires heightened review and that one "special factor" that might warrant state interference was if the parent were declared unfit. *Troxel*, 530 U.S. at 68. She summarized:

> In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court *must* accord at least some special weight to the parent's own determination.

*Troxel*, 530 U.S. at 70 (emphasis added). Thus, if a parent is unfit, then clearly under this approach, the state intrusion into the relationship is warranted. Justice O'Connor concluded:

> As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a "better" decision could be made. Neither the Washington nonparental visitation statute generally—which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.

*Troxel*, 530 U.S. at 72-73. She declined to issue a *per se* ruling on the constitutionality of grandparental visitation statutes, preferring instead to allow state courts to resolve the issue as well as the disposition.

Justice O'Connor's opinion in the case was joined by Chief Justice Rehnquist and Justices Breyer and Ginsburg. Justices Souter and Thomas concurred in separate opinions. Justice Souter's reasoning departed from Justice O'Connor's opinion in that he would have facially invalidated the Washington statute in the same manner as the Washington Supreme Court did. Justice Thomas also concurred. He initially noted his reservations about substantive-due-process jurisprudence generally but concurred in the judgment because the parties did not ask the court to overrule its precedent holding that parents have a fundamental rights to raise their children. He also noted that none of the opinions set out a standard of scrutiny to which courts should hold nonparental visitation statutes. He urged state courts to apply strict scrutiny to these statutes in the same manner that the Washington Supreme Court did.

Justice Stevens, Scalia, and Kennedy each dissented. Justice Stevens would have reversed and remanded for the Washington Supreme Court to judicially narrow the terms of the statute. Justice Stevens's dissent also noted that Justice O'Connor's opinion focused solely on the parent's liberty interest in raising the child. However, he noted that there are many interests at stake, including

the child's interest in forming a relationship with a grandparent. Justice Stevens specifically rejected the notion that there must be a threshold showing of unfitness on the part of the parent before nonparental visitation is permissible. He would instead invoke a balancing approach, weighing all of the interests at stake in any given case.

Justice Scalia would have reversed and dismissed the case. In his opinion, it is the state legislatures that have the power to enact family-law legislation, and he questioned the validity of any substantive due process right to parent a child. He would decline to "federalize" family law, reasoning that state legislatures are better equipped to make law in the family-law area. Justice Kennedy also dissented and would have reversed and remanded the case. He agreed that parents have a Fourteenth Amendment right to parent their children without undue state interference, but he asserted that with today's changing family structure a best-interests balancing test was the most appropriate standard of review.

To summarize, six Justices agreed that the case should be affirmed (O'Connor, Rehnquist, Ginsburg, Breyer, Souter, and Thomas). Eight Justices agreed that the Fourteenth Amendment protects a parent's right to raise his or her child without undue interference from government (all but Scalia; Thomas with reservations). Five Justices agreed that a fit parent is accorded a presumption that the parent acts in the child's best interests (O'Connor, Rehnquist, Ginsburg, Breyer, and Stevens). Four Justices (O'Connor, Rehnquist, Ginsburg, and Breyer) agreed that "special factors" must "justify" the state's intrusion, and that one of those factors is a finding of parental unfitness.

c. Standard of Review.

■ ■ We begin our analysis of the instant case by concluding that Lea Ann, as a single parent, has a fundamental right under the Fourteenth Amendment in prohibiting state intrusion on her parenting of Brandon. The next question, then, is what level of scrutiny this court should apply when examining the constitutionality of the state's intrusion upon her right. Most courts that have addressed this issue have used the analysis of the strict-

scrutiny review. *See, e.g.*, *Roth v. Weston*, 259 Conn. 202, 789 A.2d 431 (2002); *Santi v. Santi*, 633 N.W.2d 312 (Iowa 2001); *In re Smith*, 137 Wash. 2d 1, 969 P.2d 21 (1998). The United States Supreme Court, however, did not directly address whether strict scrutiny is appropriate in *Troxel*. Only Justice Thomas in his concurring opinion advanced the idea that strict scrutiny should be the standard of review for any impingement on this fundamental right.

 Nevertheless, assessment of intrusions on other fundamental rights have traditionally been reviewed by the Court under the strict scrutiny standard. *See, e.g.*, *Washington v. Glucksberg*, *supra*; *Reno v. Flores*, 507 U.S. 292 (1993). The notable exceptions are the cases in which the Court has balanced two equally compelling interests or fundamental rights. In these cases, the Court has rejected strict scrutiny and instead adopted a balancing test. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (plurality opinion) (balancing the state's compelling interest in protecting life of the unborn against the burden on a woman's privacy right to terminate a pregnancy); *Cruzan v. Missouri Dep't of Health*, 497 U.S. 261 (1990) (balancing a patient's right to refuse medical treatment against the state's equally compelling interest in safeguarding an individual's personal choice between life and death).

 We hold that strict scrutiny is the standard that should apply to this case. Here, we have only one fundamental right at issue—Lea Ann's right to raise her child—and one statutorily created procedure for a judicial award of grandparental visitation. As Justice O'Connor noted in *Troxel*, grandparental visitation has no historic roots in the common law but rather is a legislated creature of the late twentieth century. *Troxel*, 530 U.S. at 96–97 (plurality opinion); *see also Brooks v. Parkerson*, 454 S.E.2d 769, 770 n.2 (Ga. 1995) ("At common law grandparents had no legal right of visitation with their grandchildren over the objections of the parents."); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993).

The State argues that we should review the constitutionality of the GPVA under a rational-basis standard, but cites no authority

in support of this contention. We disagree and will apply the strict scrutiny standard to our analysis of this case.

d. Facial Unconstitutionality

We turn then to Lea Ann's challenge that the·GPVA is unconstitutional on its face. A facial invalidation of a statute is appropriate if it can be shown that under *no* circumstances can the statute be constitutionally applied. *United States v. Salerno*, 481 U.S. 739 (1987). Here, we conclude that the GPVA could be constitutionally applied in a narrow category of cases. As a prerequisite to filing a petition, the statute requires the following:

> (c) The provisions of subsections (a) and (b) of this section shall only be applicable in situations:
>
> (1) In which there is a severed marital relationship between the parents of the natural or adoptive children by either death, divorce, or legal separation; or
>
> (2) In which the child is in the custody or under the guardianship of a person other than one (1) or both of his or her natural or adoptive parents; . . .

Ark. Code Ann. § 9-13-103 (Repl. 2002). Thus, § 9-13-103(c)(2) would allow a grandparental visitation petition to be filed against a person or entity that had no Fourteenth Amendment parental rights and, thus, no fundamental interest at stake. For example, if a child was in the custody of the State Division of Youth Services, section (c)(2) would allow the grandparents to petition for visitation. In that situation, there would be no fundamental parental right at stake, and a trial court would be perfectly within its legal bounds to decide what is in the best interest of the child and apply the statute accordingly.

Facial invalidation of the GPVA is, therefore, inappropriate. We hold as we do, even though we note that the trial court implored any reviewing court to find that its order either complied with *Troxel* or that the GPVA is unconstitutional on its face. We decline to declare that the statute is facially invalid for the reasons given.

e. Unconstitutional As Applied.

We next address whether the GPVA is unconstitutional as applied. Stated differently, under a strict-scrutiny analysis, we must resolve whether this State has a compelling interest in judicially interfering with Lea Ann's fundamental parenting rights. In assessing our GPVA in light of *Troxel*, we immediately discern a major deficiency. Rather than giving the parent's decision presumptive or special weight in deciding whether grandparental visitation is in the best interest of the child, as *Troxel* requires, the GPVA makes no provision for that but leaves the decision solely to the discretion of the trial court. Ark. Code Ann. § 9-13-103(a)(2) (Repl. 2002). Furthermore, when denying grandparental visitation, the GPVA requires that the trial court state the reasons for the denial in writing. Ark. Code Ann. § 9-13-103(a)(3)(A) (Repl. 2002). No concomitant requirement that the reasons be stated in writing is required when a trial court grants grandparental visitation. The net result is that the trial court may grant grandparental visitation without the burden of stating its reasons, but denial by the trial court requires justification and implicitly places the burden of proof on the parent. By this requirement, the General Assembly has incorporated a procedural preference for granting such rights as opposed to denying them. This preference is directly at odds with the presumptive effect given to the parent's wishes under *Troxel* and, in effect, shifts the burden of proof to the parent.

We next address the fitness issue and the trial court's August 9, 2000 order. According to that order, Lea Ann is found to be a fit mother. That order reads: "The natural mother of the child is suitable to provide day-to-day care of the child" and "she adequately cares for her child and there is an obvious loving parental bond between mother and child." The order concludes "that the custody of the child is to be with Lea Ann as she adequately provides for this [sic] daily needs."

Despite the explicit finding of fitness and the related award of custody to Lea Ann, the trial court's order then discusses grandparental visitation. It describes Lea Ann and her behavior as "irrational concerning the grandfather and not in touch with reality," "not fit to make the decision on behalf of the child as regards

contact with the paternal grandfather," "delusional on the point of the court ordered visitation," and "totally unfit to make the decision concerning grand parental visitation." The trial court concludes:

> For a person to react as has the defendant in this case is not an exercise in rationality. For a person to react as has the defendant overcomes the presumption of a parent acting in the best interest of a child. This is not just the court disagreeing with a decision made by a parent[.] [I]t is much more and satisfies the *Troxel* criteria. If it does not then no case ever will and the trial court implores any appellate court that may review this decision to declare the grandparent visitation law unconstitutional in toto. For a person to react as the defendant has in this case exhibits total irrationality and lack of judgment concerning the welfare of a child on the part of the mother. The behavior of the defendant has reached the level that justifies the court interfering in the parents liberties to make all decisions for the minor child.

The trial court concluded that the GPVA was constitutional.

 It appears that the trial court found Lea Ann to be a fit parent for all purposes save one: making the decision about Brandon's relationship with his paternal grandparents. This finding of fitness is corroborated by the court's grant of custody to her and his remarks about her suitability as a parent and her loving bond with Brandon. It is only with respect to making visitation decisions that Lea Ann was found to be wanting and unfit. The question then becomes whether unfitness solely to decide visitation matters is a compelling interest on the part of the State that warrants intrusion on a parent's fundamental parenting right and overcomes the presumption in the parent's favor. We conclude that it is not. So long as Lea Ann is fit to care for Brandon on a day-to-day basis, the Fourteenth Amendment right attaches, and the State may not interfere without a compelling interest to do so. As Justice O'Connor wrote in *Troxel*, the State must accord "special weight" to the mother's decision so long as she is a fit mother. *See Troxel* at 68-69.

One other jurisdiction has addressed an analogous question regarding unfitness to make a visitation decision. *See In re Custody of Nunn*, 103 Wash. App. 871, 14 P.3d 175 (2000). In *Nunn*, the

appellate court considered a paternal aunt's argument that the mere fact that the natural mother of the child was rejecting contact with the paternal relatives made her unfit. The court framed the issue as follows:

> And so the question boils down to this: Can an otherwise fit parent be found unfit because she chooses to fight a nonparental custody petition, because she openly expresses her dislike of the side of the family that brought the custody petition, because she avoids old family friends who are supporting the other side in the custody litigation, because she doesn't trust the custody evaluators who have been brought into the litigation, and because she doesn't foster a good relationship between her child and all of those people? The answer is no.

*Nunn*, 103 Wash. App. at 887-88, 14 P.3d at 184. The court went on to say: "It would be an anomaly to consider an otherwise fit parent unfit simply for exercising her fundamental right as a parent to limit visitation of her children with third persons—even if, as in *Smith*, those third persons are loving family members and close friends of family." *Id*. at 888, 14 P.3d at 184.

In short, we decline to hold that unfitness to decide visitation matters objectively equates to unfitness to parent sufficient to warrant state intrusion on the parent's fundamental right. Were we to decide otherwise, any custodial parent refusing visitation would be subject to a trial court's nonparental visitation order on grounds that the parent was unfit to decide the matter. Such a conclusion would be at odds with the Supreme Court's decision in *Troxel*. There must be some other special factor such as harm to the child or custodial unfitness that justifies state interference.

 The appellees further contend that the instant case differs from *Troxel* in that here Lea Ann refused all grandparental visitation whereas in *Troxel* the parent was agreeable to some visitation. The trial court also mentioned that distinction. We disagree that this factual distinction represents a basis for rendering *Troxel* inapposite. The Supreme Court has addressed grandparental visitation in one case since its decision in *Troxel*. *See Dodge v. Graville*, 121 S. Ct. 2584 (2001) (memorandum decision). In *Dodge*, the court summarily vacated a decision of the Arizona Court of Appeals, which had limited a parent's right to cut off *all*

grandparental visitation and cited *Troxel* as authority for doing so. While this court can only speculate on the Court's reasons for vacating the Arizona Court of Appeal's decision in *Dodge*, it is apparent that, in the Court's view, cutting off some or all parental visitation, in and of itself, was not the critical point on which the *Troxel* decision turned.

■ As a final point, the appellees contend that this court held that the GPVA is constitutional in the case of *Reed v. Glover*, 319 Ark. 16, 889 A.W.2d 729 (1994). We disagree with the appellees' conclusion. At issue in *Reed*, which was handed down pre-*Troxel*, was whether the GPVA discriminated against illegitimate children in violation of the equal protection clause of the Fourteenth Amendment. The other issue in *Reed* was whether a grandparent's due process rights were violated because visitation was taken from her without a hearing. We decided both issues against the grandparent, primarily because no convincing authority was cited by her in support of her contentions. Those issues are a far cry from what confronts us in the present case. We hold that the GPVA was unconstitutional as applied in this case and, as a result, violated Lea Ann's fundamental liberty interest under the due process clause.

f. Disposition

We are next confronted with how to dispose of this case in light of the GPVA's unconstitutionality, as applied to this case. The options are either reversal and dismissal for the General Assembly to correct the GPVA's constitutional lapses, or a remand to the trial court accompanied by an attempt by this court to correct those lapses by judicially narrowing the statute.

State courts, since *Troxel*, appear to be equally divided on whether to construe their particular statutes so as to render them constitutional. *See, e.g., In re Paternity of Roger D.H.*, 2002 WL 59233 (Wis. App. Jan. 17, 2002) (publication decision pending) (reversing with instructions to give mother's wishes "presumptive weight" on remand); *Zeman v. Stanford*, 789 So. 2d 798, (Miss. 2001) (using ten pre-*Troxel* factors to determine best interest of child); *Crafton v. Gibson*, 752 N.E.2d 78 (Ind. App. 2001) (revers-

ing with instructions to give "special weight" to parent's wishes on remand). *But See, e.g., DeRose v. DeRose*, 634 N.W.2d 859 (Mich. App. 2002); *Punsly v. Ho*, 87 Cal. App. 4th 1099, 105 Cal. Rptr. 2d 139 (2001) (reversing, stating that "where it is apparent that a visitation order violated the Constitution, the court should not force the parties into additional litigation"); *Kyle O. v. Donald R.*, 85 Cal. App. 4th 848, 102 Cal. Rptr. 2d 476 (2000) (same). *See also Troxel* at 101 (Kennedy, J., dissenting) (noting the harmful effects of protracted visitation litigation).

We note that the states reading factors into their grandparent-visitation statutes for determining the best interest of the child have statutes that differ from our GPVA. For example, the Mississippi statute provides that the trial court must find that (1) the grandparent has established a viable relationship with the grandchild, and (2) that denial of visitation was unreasonable, as well as a finding that such visitation would be in the best interest of the child. *See Stacy v. Ross*, 798 So. 2d 1275 (Miss. 2001). In West Virginia, the statute includes a burden-of-proof standard requiring the grandparents to prove by a preponderance of the evidence that the requested visitation is in the best interest of the child. *Brandon L. v. Moats*, 209 W. Va. 752, 551 S.E.2d 674 (2001).

This court's jurisprudence has recognized a reluctance to read language into a statute to render it constitutional. In *Shoemaker v. State*, 343 Ark. 727, 736, 38 S.W.3d 350, 355 (2001), we declined to salvage a facially unconstitutional statute by narrowing its scope. We said:

> Were this court to read into the statute a limitation to "fighting words," we would clearly be legislating in order to save the statute. This we will not do.

At issue in *Shoemaker* was a teacher-harassment statute which we declared unconstitutional as facially offensive to the First Amendment because it criminalized valid free speech.

On the other hand, in *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999), this court remanded a case involving a child's name change for the trial court to consider certain factors in reaching its decision regarding the best interest of the child. The

pivotal difference between our opinions in *Shoemaker* and *Huffman* is that in *Shoemaker* the constitutionality of a vague statute was at issue, and we declined to construe the statute to eliminate the vagueness as that would be legislating. In *Huffman*, the constitutionality of the statute was not involved. We merely employed factors for the trial court to consider in determining the best interest of the child when a name change was the issue under Ark. Code Ann. § 20-18-401 (Repl. 2000).

 For this court to completely overhaul our GPVA would be a significant task. Our GPVA gives no presumption to the parent's wishes. But, equally as important, it procedurally favors the granting of grandparental visitation, and, thus, implicitly shifts the burden of proof to the parent. Finally, it fails to spell out under what circumstances would parental unfitness or harm to the child would warrant state intrusion. While it may appear better on the surface not to dismiss this case altogether, the alternative is to completely rewrite the GPVA, contrary to express legislative intent. This is best left to the General Assembly to do, should it be so inclined at its 2003 session.

The Michigan Court of Appeals, considered its own grandparent-visitation statute in light of *Troxel*, and is convincing in its analysis:

> This leads us to the question whether we could and should endeavor to interpret Michigan's statute in a manner consistent with the constitution. However, such an effort would require a significant, substantive rewriting of the statute. To render the statute constitutional, we would have to read into it requirements that go beyond the text of the statute and do more than simply define the term "best interests of the child" more clearly. We would have to go from the judicial robing room to the legislative cloak room and we decline to do so. In short, the rewriting of the grandparent visitation statute is a task best left for the Legislature.

*DeRose v. DeRose*, 643 N.W.2d 259 (Mich. App. 2002). Our decision not to legislate is also consistent with the path taken in other jurisdictions when the issue is whether to depart from legislative intent. *See, e.g., Florida v. Cronin*, 774 So. 2d 871, 874 (Fla. App. 2000), *Quoting Meyer v. Caruso*, 731 So. 2d 118, 126 (Fla.

App. 1999) ("It is fundamental that judges do not have the power to edit statutes so as to add requirements that the legislature did not include.")); *Salem College & Academy, Inc. v. Employment Div.*, 298 Or. 471, 695 P.2d 25 (1985).

There is one final point. Justice Kennedy observed in *Troxel* that "a domestic relations proceeding in and of itself can constitute state intervention that is so disruptive of the parent–child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes complicated." *Troxel* at 101 (Kennedy, J., dissenting). *See also Punsly v. Ho, supra.* Justice Kennedy's observation is instructive. The Linders have been engaged in this struggle over grandparental visitation for four years—more than half of Brandon's life. Until the General Assembly fashions a statute that meets the requirements of *Troxel*, this matter should be laid to rest.

Reversed and dismissed.

HANNAH, J., concurring in part and dissenting in part.

JIM HANNAH, Justice, concurring in part; dissenting in part. I agree that the grandparents–visitation statute may apply to guardians and other nonparental custodians, and on that basis it is not facially unconstitutional. However, I disagree that this statute is unconstitutional as applied.

I do agree that the language of the statute needs revision. If the legislature were to redraft the statute in light of the long history of decisions of this court concerning the right of a parent to raise their child, and the presumption that a parent is acting in the best interests of their child in making decisions concerning the child, as well as the United States Supreme Court decision in *Troxel v. Granville*, 530 U.S. 57 (2000), the confusion would be resolved, and the task assigned to the trial courts would be much easier and would produce more predictable results. It is also troublesome that our present statute requires the trial court to state in writing why grandparent visitation is being denied, but requires no statement in writing when grandparent visitation is granted. Inclusion of factors the trial court must consider in its analysis required under the statute would also be helpful. *See, Martin v.*

*Coop*, 693 So.2d 912 (Miss. 1997). Nonetheless, under the facts of this case, I would affirm the trial court's decision holding the statute was not unconstitutional as applied but I would reverse and remand this case for reconsideration of visitation granted to the grandparent.

As the United States Supreme Court held in *United States v. Salerno*, 481 U.S. 739 (1986), "the mere fact that [a legislative] Act might operate unconstitutionally under some conceivable circumstances is insufficient to render it wholly invalid." *Salerno*, 481 U.S. at 745. More specifically, a statute may sometimes be preserved by the courts by simply restricting its application. *Shoemaker v. State*, 343 Ark. 727, 38 S.W.3d 350 (2001). This could be done by requiring application of the preexisting presumption in favor of parents, as was done by the trial court in this case.

The trial court specifically noted *Troxel, supra*, and specifically stated its analysis was intended to comply with the requirements set out therein. When the trial court's nine-page decision is read in total, it is apparent the trial court was considering the grandparent-visitation rights under the statute in light of the mother's parental rights and interests. In fact, on page seven, the trial court states, "The behavior of the defendant has reached the level that justifies the court interfering in the parent's liberties to make all decisions for the minor child." The trial court further found that the presumption in Lea Ann's favor was overcome.

A brief review of the record reveals a parent who behaved irrationally in a number of ways, in directly disobeying orders of the court, and in fleeing the jurisdiction. It is apparent that the trial court was considering both Lea Ann's parental rights and the best interest of Brandon. I do not believe that the trial court's decision to leave Brandon in the custody of Lea Ann may be read so broadly as the majority does. Clearly, the trial court is concerned about Lea Ann's care of Brandon in a much more general sense even if the order might have been worded more clearly.

I also write to emphasize that this decision is narrow in scope and applies only to visitation issues arising from application of Ark. Code Ann. § 9-13-103 (Repl. 2002). In other words, this decision is limited to an attempt by grandparents to obtain visitation under

the subject statute. The analysis should not be confused and applied in a case where the State is determining custody, and visitation on other basis, including other statutory schemes, or under the State's exercise of its sovereign *parens patriae* power in protection of the children of this State.

The issue of grandparent visitation did not originate with the subject statute investing grandparents with a statutory right to commence an action to obtain visitation. Mention of visitation granted grandparents may be found in our case law stretching back to the 1950s at the least. *Parks v. Crowley*, 221 Ark. 340, 253 S.W.2d 561 (1952); *Servaes v. Bryant*, 220 Ark. 769, 250 S.W.2d 134 (1952). However, as this court stated in *Glover v. Reed*, 319 Ark. 16, 889 S.W.2d 729 (1994), grandparent rights are derived from statutes or may be conferred by a court of competent jurisdiction. *See also, Cox v. Stayton*, 273 Ark. 298, 619, 619 S.W.2d 617 (1981). It is not clear that the action pending in the chancery court is simply an action for grandparents-visitation rights under Ark. Code Ann. § 9-13-103. Bill Linder did not even bring his petition under that statute, but rather under Ark. Code Ann. § 9-13-101 (Repl. 2002) "Award of Custody", and it should be noted that the trial court has considered custody, which is not even mentioned in the grandparents-visitation statute. Nothing in this decision prohibits the grandparents from pursuing any other avenues that might be open to them.

The trial court granted the paternal grandfather the same visitation as a noncustodial parent. Unless this visitation was granted in the context of a custody proceeding, it appears to be granted in error. Even then, absent a finding of an extremely close paternal type relationship, which was absent in the facts of this case, this amount of visitation could not have been in the best interests of this child. I would reverse and remand this case for the trial court to reconsider the paternal grandfather's visitation.