Gerald ROBINSON *v.* Karen FORD-ROBINSON

CA 04-370                                          196 S.W.3d 503

Court of Appeals of Arkansas
Opinion delivered October 27, 2004

---

*Richard Worsham*, for appellant.

*Robert D. Wills, Jr.*, for appellee.

JOHN F. STROUD, JR., Chief Judge. Appellant, Gerald Robinson, and appellee, Karen Ford-Robinson, were married January 28, 2000, separated on May 7, 2003, and a decree of divorce was entered on November 4, 2003. The parties had lived together since August 1997. Gerald had custody of his son, Austin, who was eighteen to twenty months old at the time Karen moved in with them; Austin's birth-mother's parental rights had been terminated by a divorce decree entered in the State of New York. At the time she filed for divorce, Karen initially alleged that Gerald was an unfit parent and asked that she be awarded custody of Austin; in a second amended complaint, she subsequently revised that request and instead asked that she be awarded visitation with Austin because of the mother-child relationship that she and Austin had developed since August 1997 and because it would be in Austin's best interest for her to have visitation with him. The trial judge found that Karen had stood *in loco parentis* to Austin since he was eighteen months old, that he recognized her as his mother, and that it would be in Austin's best interest to have visitation with Karen. Gerald filed a motion for reconsideration, which was deemed denied; he then filed his notice of appeal. On appeal, Gerald contends that the trial judge erred in granting Karen visitation. Specifically, he argues that the trial court erred in relying on *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988), and *Golden v. Golden*, 57 Ark. App. 143, 942 S.W.2d 282 (1997), because those rulings were overturned by *Troxel v. Granville*, 530 U.S. 57 (2000), and *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). Alternatively, he argues that if this court holds that *Golden* and *Rawlins* were not overturned, then Karen "failed to meet the standard of proof set forth in *Rawlins*." We disagree with his arguments and affirm the trial court's award of visitation to Karen.

At trial, Gerald characterized Karen's and Austin's relationship as one of "buddies." He said that he and Karen had discussed her being Austin's mother, and he told her that adoption was not

an option because Austin had a biological mother, Lisa Marie Robinson, although her parental rights had been terminated in their divorce. However, he admitted that he had described Karen's relationship with Austin as that of "mother" in e-mails and conversations that he had over the years. He acknowledged that he had executed powers of attorney for Karen so that she could get medical care for Austin when he was away, both prior to and during their marriage, but he said that was not unusual because he was in the military.

Gerald objected to Karen having any contact with Austin after the divorce because he said that she had told him one of the reasons she left was because she was a nanny, not a wife or mother. He also said that since she left, Austin had not asked for her or asked to spend any time with her, and that Austin had never cried for Karen. Gerald said that he did not want to confuse Austin because Karen had been seeing a man from work. However, he admitted that he was also seeing someone, and that he had a sexual relationship with her.

Gerald said that Karen met him at the door when he came home from temporary duty and told him that she had moved out of their residence. Prior to telling Gerald that she was leaving, Karen had taken Austin over to her new apartment without Gerald's knowledge and told him to pick out which room he wanted to be his room.

Gerald testified that he believed that Karen having visitation with Austin "would interfere with someone else playing a role model" in his life. He said that if Austin's biological mother wanted to be in his life again, he thought it would be her right to have some sort of contact. He also said that he hoped that he would meet someone else to marry that Austin could call mother, and he had concerns about there being "too many mothers" in Austin's life.

Karen testified that she came into Austin's life when he was approximately eighteen months old, that she had been his mother for almost the last seven years, and that she loved him as if she was his mother and had loved him since the day she "laid eyes on him." She described their relationship as "great," and said that Austin had called her "Mommy" since he was a little over two years old. She stated that Austin did not know that she was not his birth mother until he was in first grade. She said that Austin was a sweet, lovable child, and that she wanted to continue to have some type

of relationship with him although she had been very unhappy in her marriage to Gerald. She testified that she was not willing to try to prove that Gerald was an unfit parent.

In explaining her relationship with Austin, Karen said that she loved him and cared for him; that she went to all of his parent-teacher conferences, games, and school functions; and that she was a good mother and role model for him. She said that she wanted visitation because she loved Austin, they had a good relationship, and she felt that it would be in his best interest for them to be able to continue that relationship.

Karen admitted that she took Austin to her new residence and let him pick out a room before she told Gerald that she was moving out; however, she explained that she did not want Austin to think that she had "skipped town or abandoned him." She agreed that it might be confusing for Austin to possibly end up having three mothers, but she also said that she thought it would be confusing for him not to have the person whom he called mother for over six years in his life anymore. She said that Gerald had told her that they were a package deal — if she did not want him then she could not have Austin.

Tommye Jo Ford, Karen's mother, testified that Karen and Austin had a very close relationship and that Karen had immediately fallen in love with Austin when she met him. She said that the two of them really bonded as mother and son. She stated that Austin began referring to Karen very early in the relationship as Mommy. She said that Karen was Austin's mother in every sense of the word for over six years, and that she believed that Austin would benefit from any visitation he had with Karen. She said that Austin was one of her grandchildren. She stated that she believed Gerald's resistance to Austin seeing her or Karen came from the fact that his mother had remarried somewhere around sixteen times, from what she had been told. However, she said that she was not saying that Gerald was an unfit father; in fact, she stated that she had nothing negative to say about Gerald's parenting ability.

Martha Wiley, an assistant director at Sylvan Hills Learning Center, testified that Austin was enrolled at the center and was a happy kid. She said that she did not know that Karen was his mother until Karen showed up at the center with cookies after she and Gerald had divorced. Wiley said that she had never seen Karen before, that Austin was not enthused to see her, and that he did not accept the cookies.

Linda Johnson, Gerald's mother, testified that Austin was worried about his daddy being by himself and did not understand why his mother was "doing this" to his daddy. She said that she had never seen Austin cry because he missed his mother.

Serena Dempsey, Austin's babysitter once or twice a month, said that she had not seen him cry because he missed his mother. She said that he did not ask about Karen, and once, when she asked him if he missed Karen, he told her, "no, not really."

Domestic relations cases are reviewed *de novo*, and the trial judge's findings will not be disturbed unless they are clearly against the preponderance of the evidence. *Golden v. Golden*, 57 Ark. App. 143, 942 S.W.2d 282 (1997). On appeal, Gerald argues that the trial court erred in granting Karen visitation with Austin. Specifically, he argues that the trial court erred in relying on *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988), and *Golden v. Golden, supra*, because those rulings were overturned by *Troxel v. Granville*, 530 U.S. 57 (2000), and *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). We disagree.

We hold that the present case is distinguishable from *Troxel* and *Linder*, both of which concern grandparent visitation. Specifically, *Troxel* involved a statute from the State of Washington that allowed any person to petition the court for visitation rights at any time, and a trial court could grant visitation when it was determined that such visitation would serve the best interest of the child. In that case, the paternal grandparents petitioned for visitation with their two granddaughters after their son's death and after the girls' mother limited their visitation to one daytime visit per month. The superior court granted grandparent visitation one weekend per month, one week during the summer, and four hours on each of the grandparent's birthdays. The Washington Court of Appeals reversed the visitation order and dismissed the case, and the Washington Supreme Court affirmed that decision. The United States Supreme Court granted *certiorari* and affirmed the denial of visitation in a plurality opinion.

In affirming the denial of visitation and holding the Washington statute unconstitutional, the Supreme Court recognized the "fundamental right of parents to make decisions concerning the care, custody, and control of their children," 530 U.S. at 66, under the Fourteenth Amendment, and held that the "breathtakingly broad" statute infringed upon that fundamental right by permitting any third party who sought visitation to subject a

parent's decision regarding visitation to state-court review. The *Troxel* court held that there was a presumption that fit parents act in the best interests of their children, and that when the Washington Superior Court intervened, it gave no special weight to the mother's determination of her children's best interests, thus failing to provide any protection for the parent's fundamental right to raise her daughters. The Court held that if a fit parent's decision is subject to judicial review, there must be accorded at least some special weight to that fit parent's determination.

However, the Court held that it did not define the "precise scope of the parental due process right in the visitation context. . . . Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." 530 U.S. at 73.

In *Linder, supra,* our supreme court held that while our state's grandparent-visitation statute was not facially invalid, it was unconstitutional as applied. In so finding, the supreme court held that the trial court found the mother to be a fit parent for all purposes except the issue of making a decision about her son's relationship with his paternal grandparents. The court held that unfitness solely to decide visitation matters was not a compelling interest on the part of the State that warranted invasion of a parent's fundamental parenting rights and reversed and dismissed the order providing visitation to the grandparents. We also note Justice Hannah's dissent in *Linder,* in which he stated:

> I also write to emphasize that this decision is narrow in scope and applies only to visitation issues arising from application of Ark. Code Ann. § 9-13-103 (Repl. 2002). In other words, this decision is limited to an attempt by grandparents to obtain visitation under the subject statute. The analysis should not be confused and applied in a case where the State is determining custody, and visitation on other bas[e]s, including other statutory schemes, or under the State's exercise of its sovereign *parens patriae* power in protection of the children of this State.

348 Ark. at 357-58, 72 S.W.3d at 861.

We hold that the facts of the present case are distinguishable from *Troxel* and *Linder.* Here, we are not dealing with statute-mandated visitation rights; rather, stepparent visitation is a creature of case law. Furthermore, the situation in the present case is one of

a person whom the trial court found had stood *in loco parentis* to the child rather than a person or persons who simply had a relationship with the child. We hold that the finding of an *in loco parentis* relationship is different from the grandparent relationships found in *Troxel* and *Linder* because it concerns a person who in all practical respects was a parent.

This court's decision in *Golden, supra,* is distinguishable from *Troxel, supra,* and *Linder, supra,* and we hold that it supports affirming the trial judge's decision to grant Karen visitation with Austin. In *Golden,* the trial judge found that the stepfather stood *in loco parentis* to the child and granted him visitation. On appeal, the natural mother argued that the trial judge erred in finding that the stepfather stood "*in loco parentis*" to the child; however, this court found no error in the trial judge's finding. Citing Black's Law Dictionary (6th ed. 1990), the court defined *in loco parentis* as "in the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities," and stated that the supreme court had held in *Moon Distrib. v. White,* 245 Ark. 627, 434 S.W.2d 56 (1968), that a stepmother stood *in loco parentis* to the minor child when they lived in the same home as mother and daughter.

In *Golden,* this court held that the circumstances warranted the finding of *in loco parentis* because the stepfather had lived with the child as his father from October 1993 until November 1994 and from December 1994 until April 1995. Although the stepfather mistakenly believed that he was the natural father in that case, he was the only father the child had ever known. In the present case, Karen was the only mother that Austin ever knew, and Austin believed that she was his natural mother until he was in the first grade. Furthermore, Karen was involved in Austin's life for a much longer period of time than was the stepfather in the *Golden* case. We cannot say that the trial judge was clearly erroneous in finding that Karen stood *in loco parentis* to Austin. We also hold that *Golden* clearly indicates that the status of *in loco parentis* permits, where circumstances warrant, that a stepparent be granted visitation with a stepchild, and such circumstances are present in this case.

Gerald alternatively argues that Karen "failed to meet the standard of proof set forth in *Rawlins.*" We find no merit in this contention. *Rawlins, supra,* involved whether a stepparent could gain custody of a stepchild, not whether a stepparent could be

granted visitation. In that case, our supreme court held that a stepparent could be awarded custody if it was established that the natural parent was unfit; however, there was a preference for natural parents in custody matters when the natural parent was a fit and proper person for custody. In that particular case, although the supreme court held that a stepparent could be granted custody, the court reversed the grant of custody to the stepfather because the trial judge had specifically found that the mother was a fit and proper person for custody. We do not find *Rawlins* to be instructive with regard to the particular situation before us.

We affirm the trial court's grant of visitation to Karen based upon the determination that she stood *in loco parentis* to Austin.

Affirmed.

PITTMAN and CRABTREE, JJ., agree.