Charles DENNISON et ux *v.*
Richard MOBLEY, Chancellor

74-106                                    515 S.W. 2d 215

Opinion delivered November 12, 1974

*Francis T. Donovan*, for appellants-petitioners.

*R. L. (Jack) Roberts, William C. Brazil* and *Guy Jones Jr.*, for appellee-respondent.

JOHN A. FOGLEMAN, Justice. Appellants Charles and Modelle Dennison seek review of an order of the Faulkner Chancery Court holding them in contempt of court for violation of an order of the court relating to the custody of their three-year-old granddaughter. The order, insofar as material, reads as follows:

1. ****Charles and Modelle Dennison failed to comply with the Court's order of reasonable visitation in that they failed to return the above named child after a three (3) hour visitation on December the 11th, 1973.

2. That said Charles and Modelle Dennison aided and abetted **** Clinton Eugene Dennison, their son, in allowing him to take Jessica Lynn Dennison outside the boundaries of the Court and the border of the State of Arkansas.

3. That the Court doth find a deliberate violation of its order of December the 11th, 1973 and that Charles and Modelle Dennison are hereby adjudged to be in contempt of this Court in that they aided and abetted one Charles Eugene Dennison from returing Jessica Lynn Dennison after the reasonable visitation had been awarded previously by this Court. The original order of December the 11th, 1973 was directed towards Charles and Modelle Dennison in that they were to comply with all Court orders directed towards Clinton Eugene Dennison.

4. That the Court finds and hereby levies a fine of $100 to be placed upon Charles and Modelle Dennison jointly. Also, a $100 a day fine, per day, until said child,

Jessica Lynn Dennison is returned to the jurisdiction of this Court and to the above named plaintiff, Pearlie Mae Dennison. That said Charles and Modelle Dennison are to remain in jail until said child is returned to this Court and that in addition to the time they are in jail an additional three (3) days is to be served by Charles and Modelle Dennison.

We first dispose of the contention of appellee that this appeal should be dismissed because review of such an order may be had only upon certiorari. Appellee is correct as to the mode of appellate review. *Johnson* v. *Johnson*, 243 Ark. 656, 421 S.W. 2d 605. This court in its supervisory capacity, however, has always been rather liberal in elevating substance above form in order to deal with a particular proceeding in a manner consistent with justice in order to expeditiously dispose of issues, when it can be done without prejudice to one not immediately before the court and there is no statutory or constitutional impediment. To this end an appeal may, in the discretion of this court, be treated as a petition for certiorari, particularly when the entire record of the proceeding is before us. *Bridges* v. *Arkansas Motor Coaches,* 256 Ark. 1054, 511 S.W. 2d 651 (1974); *Whorton* v. *Hawkins,* 135 Ark. 507, 205 S.W. 901. The entire record is before us. We find no statutory or constitutional impediments to our treating this matter on certiorari. We do not see how doing so could possibly result in prejudice to anyone not before this court. The motion to dismiss is denied, because it seems to us that the ends of justice require that we expeditiously dispose of the issues raised by appellants. We will therefore treat this appeal as a petition to quash the order on certiorari. The appellants will hereinafter be referred to as petitioners and appellee as respondent.

We may just as quickly dispose of the contention of petitioners that the chancery court was without jurisdiction over them because they were not parties to the divorce suit in which temporary custody of their granddaughter was awarded to her mother and reasonable visitation allowed her father, their son. They admit that they were present at the hearing which resulted in the entry of the order. At the inception of the hearing at which the order was entered and in the

presence of petitioners, the chancellor emphatically announced that he would jail everybody connected with the case if he had any trouble on either side, "including relatives, kinsfolk, everybody else" and would fine and put on the county farm anyone who violated his order. At the conclusion of the hearing, the chancellor forcefully cautioned that he did not expect "any more running off or snatching the child" or anything of that sort. Petitioners' attorney had admitted in open court at this hearing that they were parties to the proceeding. The chancellor directed petitioners' attorney, who was their son's attorney in the divorce suit, to explain the remark to his *clients*. A certified copy of an order awarding custody to the mother on her ex parte application and fixing the date of the hearing had directed the sheriff to accompany the mother to obtain custody and to serve a certified copy of the order on petitioners. Although no return showing service of this order on them appears in the record, Charles Dennison testified at the contempt hearing that he was present at the custody hearing because he and his wife and his son had been made parties defendant, that he fully understood what the court said on that date, and that the remarks were directed to him and his wife. One who has full knowledge of a court order and its import, as petitioners did, cannot flout it with impunity. *Hickinbotham v. Williams*, 228 Ark. 46, 305 S.W. 2d 841; See also *Whorton v. Gaspard*, 240 Ark. 325, 399 S.W. 2d 680; *Hudkins v. Arkansas State Board of Optometry*, 208 Ark. 577, 187 S.W. 2d 538. The petitioners were clearly subject to the jurisdiction of the chancery court in the contempt proceeding.

Petitioners contend that contempt on their part was not proved by a preponderance of the evidence. This presents a problem of some apparent complexity. The argument on behalf of petitioners is based wholly upon their contention that the evidence preponderates in their favor, even when they concede that the court may have punished them for both civil and criminal contempt. They say that, since the evidence preponderates in their favor, there could not have been that degree of proof required to sustain a finding of criminal contempt. They are correct as to the degree of proof required in the trial court, but they overlook the difference in appellate review of the evidence on certiorari, not only as distinguished

from its consideration by the trial court, but as between the two types of contempt. The distinction between the two and the overtones of each inherent in a child custody proceeding growing out of a divorce action were clearly recognized by the chancellor. See *Songer* v. *State*, 236 Ark. 20, 364 S.W. 2d 155.

In cases of civil contempt the enforcement of the rights of private parties to litigation is the objective. On the other hand, the primary reason for punishment for criminal contempt is the necessity for maintaining the dignity, integrity and authority of, and respect toward, courts and the deterrent effect on others is just as important as the punishment of an offender. *Hickinbotham* v. *Williams*, 228 Ark. 46, 305 S.W. 2d 841; *Lee* v. *State*, 102 Ark. 122, 143 S.W. 909; *Turk* v. *State*, 123 Ark. 341, 185 S.W. 472. The two purposes merge in a case such as this. *Songer* v. *State*, supra.

The distinction and the reasons therefor have been discussed by us in *Blackard* v. *State*, 217 Ark. 661, 232 S.W. 2d 977, as well as in *Songer*. In *Songer* we said:

> *****It is not questioned that punishment for civil contempt will be upheld by this Court unless the order of the trial court is arbitrary or against the weight of the evidence. However, it is not necessary for us to hold the petitioner was found guilty of only civil contempt in order to sustain the trial court. We think the trial court should be sustained even if the petitioner were guilty of criminal contempt.

After stating the rule of appellate review set out in *Blackard,* we said:

> Weighing the testimony under the above rules, we find there is substantial evidence to support the order of the trial court.

In *Blackard,* we had said:

> One of the reasons for the distinction between criminal contempt and civil contempt is because it is generally held that in criminal contempt proceedings the proof must be beyond a reasonable doubt. In the case at bar

the proceedings involve criminal contempt; and the trial court held that the proof had to be beyond a reasonable doubt, just as in a criminal case. This ruling was correct. *****

On review by this Court in such proceedings by *certiorari*, we do not try the criminal contempt case *de novo*, despite any such language so intimating as contained in *Jones* v. *State*, 170 Ark. 863, 281 S.W. 663. Rather, we review the evidence just as we would in an appeal in any criminal case. The trial court in the first instance, in a criminal contempt proceeding, must find the cited person guilty beyond a reasonable doubt. Then, on *certiorari* proceedings this Court reviews the record to determine whether the evidence, when given its full probative force, is sufficient to sustain the finding of the trial court. *****

*****As previously stated, we review the evidence in this case just as we would an appeal in an ordinary criminal case, that is, to determine whether the evidence, when given its full probative force, is sufficient to sustain the finding of the trial court.

Of course, in a criminal case, we do not consider whether the guilt of an accused is proven beyond a reasonable doubt, since the test on appellate review is whether there is any substantial evidence to support the fact finder's verdict. *Pharr* v. *State*, 246 Ark. 424, 438 S.W. 2d 461; *Morrow* v. *Roberts*, 250 Ark. 822, 467 S.W. 2d 393; *Graves* v. *State*, 236 Ark. 936, 370 S.W. 2d 806. In *Graves* we said:

Upon the conflicting testimony the issues of fact were properly submitted to the jury. The appellants are in error in arguing that the State's failure to prove its case beyond a reasonable doubt entitles them to a reversal. The jury must be convinced of the accused's guilt beyond a reasonable doubt, but there is no requirement that the members of this court be similarly persuaded by the proof. Here the test is that of substantial evidence. If the verdict is supported by such proof we are not at liberty to disturb the conviction, even though we might think it to be against the weight of the evidence. *Fields* v. *State*, 154 Ark. 188, 241 S.W. 901.

In a criminal case we do not disturb the fact finder's findings on fact issues unless there is no substantial evidence to support them. *Inklebarger* v. *State*, 252 Ark. 953, 481 S.W. 2d 750.

Even though civil contempt findings are reviewed to determine where the preponderance of the evidence lies, we only examine the record for substantial evidence in criminal contempt cases and affirm a judgment finding criminal contempt unless we find no substantial evidentiary support. If we did not make this quite clear in *Blackard* and *Songer* we set the matter at rest in *Morrow* v. *Roberts*, supra and *Vandergriff* v. *State*, 239 Ark. 1119, 396 S.W. 2d 818. We must be able to say that there was no substantial evidence to connect the alleged contemnor with the acts charged before we can quash the order on certiorari. See *Whorton* v. *Gaspard*, 240 Ark. 325, 399 S.W. 2d 680. It must also be remembered that, as in criminal cases, circumstantial evidence is substantial evidence when it is properly connected and does more than arouse suspicion. See *Songer* v. *State*, supra; *Whorton* v. *Gaspard*, supra; *Ledford* v. *State*, 234 Ark. 36, 351 S.W. 2d 425.

The chancellor's findings and the punishment mated out, particularly when considered along with his opening and closing admonitions, clearly indicate that he considered the proceeding as one for both civil and criminal contempt in the light of such cases as *Songer*. The $100 fine and three days' jail sentence, characteristic of punishment for criminal contempt, were in addition to the civil contempt penalty obviously calculated to bring about compliance with the custody order, i.e., the fine of $100 per day and a commitment to jail until the child was returned to her mother.

Inasmuch as we are unanimously of the view that the order must be quashed, insofar as the alleged civil contempt is concerned, as clearly against the preponderance of the evidence, we will summarize the evidence only insofar as necessary to determine whether there was any substantial evidence to support the finding of criminal contempt. In doing this, we view it as we would in an ordinary criminal case, i.e., in the light most favorable to the court's findings, drawing all inferences and resolving all conflicts against petitioners. *Graves* v. *State*, 256 Ark. 117, 505 S.W. 2d 748 (1974); *Elser* v. *State*, 243 Ark. 34, 418 S.W. 2d 389.

Pearlie Maye Dennison and Clinton Eugene Dennison, son of petitioners, were married February 7, 1970. Jessica Lynn, aged three at the time of the custody hearing, was born to that marriage. Pearlie Maye had two children by a previous marriage. In December of 1971, she left Jessica Lynn with petitioner Modelle Dennison and her two other children with their maternal grandmother. Her purpose in doing so was to go to Alaska to aid in getting the son of petitioners out of jail. She wrote and signed a note dated December 19, 1971, stating that she had placed Jessica Lynn in the custody of the senior Dennisons, because of ill feelings between her mother and Mrs. Modelle Dennison. It read:

> "I, Pearl Dennison leave my Daughter, Jessica Lynn Dennison in the custody of Mr. and Mrs. Charles Dennison.
>
> In the event anything should happen to myself, she shall remain in their custody."

Pearlie May Dennison had understood that her husband would be placed in her custody or otherwise released upon her arrival in Alaska, but this did not occur. She related that it took her until February, 1972 to get him out of jail, that they obtained jobs but their employers failed to pay them, that the two separated, that she had undergone surgery, and that she had been unable to come back to get the baby until March, 1973. In the interim her mother supported her while she saved money for a plane ticket to return. When she did, she found that Jessica Lynn had been taken to Louisiana. Petitioners did not want her to see the child when she got there and Modelle Dennison struck her on the back of the head when she attempted to hold the baby while visiting her at petitioners' home.

On November 26, 1973, Pearlie Maye filed suit for divorce in which she sought custody of Jessica Lynn. The ex parte order mentioned earlier was issued the following day. On December 11, 1973, the temporary custody order was entered. Immediately after this hearing, the Dennisons (father and grandparents) picked up the child for a three-hour visitation from 5:00 p.m. to 8:00 p.m. The mother's con-

cern about the 8:00 p.m. termination was attributed to the fact that she put this child and her two others to bed at that hour. She denied that the baby was sick, as petitioners contend, or had a high fever. She attributed the child's "runny nose" to the fact that the weather had just turned cold. The mother of the child stated that Mrs. Dennison, Sr. drove the car to her house when the child was picked up because her son, the child's father, did not have a driver's license and "she absolutely will not let him use any of the vehicles around the house."

Petitioner, Charles Dennison, admitted that as soon as they reached his home with the child, he told his son to take the child to the doctor immediately to get a statement from the doctor. The elder Dennison wanted the son to see "the welfare" the next day and have the doctor find out "just how sick she is," hoping to gain some advantage for the son at the next hearing. He said he found that the son had taken the child to a doctor in Louisiana when he "called down there" and learned "he took her to a doctor as soon as he got to his place." He knew that his son had been in trouble "with the law" previously. Sheriff Martin, a character witness called by petitioners, testified upon inquiry by their attorney that the son's reputation was "not too good."

Petitioner Modelle Dennison "guessed" that she left the keys in the car her son used in taking the child away, and said she saw him drive it out the driveway. About 8:20 p.m., she called her attorney, who was then her son's attorney, to advise him that the son had taken the child to a doctor, "in case anything came up."

It is true that there are conflicts in the testimony here and that conflicting inferences might have been drawn. Yet, every presumption must be indulged in favor of the court's judgment. *Davies* v. *State*, 73 Ark. 358, 84 S.W. 633. When there are conflicts in the testimony, it is our duty to give the same force to the findings of the trial court in contempt proceedings as we do in other cases when there is a conflict in the testimony. *Ex Parte Winn*, 105 Ark. 190, 150 S.W. 399.

Perhaps there is no case in which the court's observation of the parties, and their demeanor and conduct, including

their manner of speaking and tone of voice, their facial expressions and body movements, can be more important than on a charge of contempt, particularly criminal contempt, of which attitudes of the alleged contemnor can be such an integral part. When we accord due deference to the superior position of the chancellor, we must resolve all inferences in favor of his finding. We must say that the child was not sick, but only had a runny nose, just as many other children had at that season, according to her mother. The mother's testimony in this regard must be taken as corroborated by the high-sounding name, "upper respiratory infection", which may be used to describe a cold or "running nose." See *2 Gray's Attorney's Textbook of Medicine*, 37-2 § 37.01. We must say that the mother permitted her son to use the car he had not been previously permitted to drive to take the child away, and that the parents were not motivated by concern for the baby's well being but were endeavoring to gain an advantage for their son in the battle for custody. How did the grandmother know at 8:20 p.m. that her son nad not returned the child to its mother by 8:00 p.m., or anticipate that something might come up about the failure, if she was ignorant and innocent of any violation of the terms of the visitation? The grandfather certainly knew how to locate his son and grandchild to "learn" about the trip to the Louisiana doctor.

When all the circumstances are considered, we cannot say that there was no substantial evidence to support the finding of criminal contempt. Whether the idea of taking the child outside the jurisdiction of the court originated with petitioners or their son is immaterial, for they are guilty of contempt if they maintained in motion contemptuous conduct originated by him. *Bates* v. *State*, 210 Ark. 652, 197 S.W. 2d 45. This they did by aiding and assisting him, if reasonable inferences to be drawn from the testimony are drawn in favor of the court's findings.

When there are mitigating circumstances and the ends of justice can be adequately sustained by the payment of a fine and the serving of some part of a jail sentence, it has been our practice to modify the judgment by reducing the punishment imposed. See *Garnet* v. *Amsler*, 238 Ark. 34, 377 S.W. 2d 872; *Pace* v. *State*, 177 Ark. 512, 7 S.W. 2d 29; *Baker* v. *State*,

177 Ark. 13, 5 S.W. 2d 337; *Lockett* v. *State*, 145 Ark. 415, 224 S.W. 952; *Poindexter* v. *State*, 109 Ark. 179, 159 S.W. 197. There are mitigating circumstances here.

These grandparents had the responsibility for the child for most of her life, which could be calculated to have produced a genuine concern on their part for her welfare. Even though the mother made an explanation for failing to reclaim custody sooner, there is still reason to doubt that she was always motivated by a normal concern for her baby's welfare during her prolonged absence. There seems to have been a Louisiana decree purporting to award custody to their son. The child was taken to a doctor upon his arrival in Louisiana. The petitioners were immediately committed to jail at the conclusion of the hearing on the citation. They remained in jail until released on bail by order of this court entered the next day. They must have remained in jail at least overnight. In view of these circumstances and our reversal of the civil contempt feature of the chancery court's order, we are not convinced that the ends of justice require that petitioners be again confined to jail on the criminal contempt conviction. Accordingly, we reduce the jail sentence to the time served.

As thus modified, that part of the chancery court's order holding petitioners in criminal contempt is sustained, but that part holding them in civil contempt is quashed.