Greg HUNT *v.* Nancy PERRY

03–420 138 S.W.3d 656

Supreme Court of Arkansas
Opinion delivered December 11, 2003

[Petition for rehearing denied January 15, 2004.*]

---

* DICKEY, C.J., not participating.

*Joel W. Price*, for appellant.

*Peel Law Firm, P.A.*, by: *John R. Peel*, for appellee.

DONALD L. CORBIN, Justice. This case presents another challenge to the Arkansas Grandparent Visitation Act ("GPVA"), codified at Ark. Code Ann. § 9-13-103 (Repl. 2002).[1] Appellant Greg Hunt appeals the order of the Yell County Circuit Court denying his petition to terminate Appellee Nancy Perry's visitation rights with his two children. On appeal, Hunt argues that the trial court erred in ruling that *res judicata* barred his challenge to the constitutionality of the GPVA. He also argues that the trial court erred in failing to find that there had been a change in circumstances warranting termination. As this appeal involves an issue of first impression and requires development of the law, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) and (5). We affirm.

---

[1] Section 9-13-103 was amended by the General Assembly in 2003, following this court's holdings that the statute was unconstitutional as applied in *Seagrave v. Price*, 349 Ark. 433, 79 S.W.3d 339 (2002), and *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002).

Greg Hunt is the father of two children, Ali and Seth. The children's mother, Karen Hunt, died on October 6, 1999. Prior to her death, she and Greg adopted Ali, who was born on March 26, 1995. Seth was born to the couple on December 26, 1997. Prior to the death of Karen, Karen's mother, Nancy Perry, visited the family regularly and had regular contact with her grandchildren. Immediately following Karen's death, Nancy continued to visit her son-in-law and grandchildren.

On February 4, 2000, Greg married Gretchen Hunt, who had three children of her own. Greg sought to adopt Gretchen's children, and she did the same with his. While the record is not clear as to the cause, it is apparent that Greg's relationship with Nancy began to deteriorate sometime after his remarriage. This deterioration culminated in Greg and Gretchen sending Nancy a letter notifying her that she would be allowed to see her grandchildren once every three months for a period of three hours, with the entire Hunt family present. This letter was dated August 2, 2000.

Soon after, on August 21, 2000, Nancy filed a petition seeking visitation with Ali and Seth, pursuant to section 9-13-103. Greg challenged Nancy's attempt to obtain visitation, arguing that the GPVA was unconstitutional and that visitation was not in the best interests of his children. The State intervened in the action on November 1, 2000, arguing that the GPVA was constitutional. Immediately prior to the commencement of this litigation, the United States Supreme Court handed down *Troxel v. Granville*, 530 U.S. 57 (2000), invalidating a Washington statute permitting grandparent's visitation. Greg filed a motion for summary judgment on August 30, 2000, arguing that in light of the Supreme Court's decision in *Troxel* the court should find the Arkansas statute unconstitutional as well. Following a hearing on the summary-judgment motion, the trial court entered an order finding that the Arkansas statute was not rendered invalid by the decision in *Troxel* because Arkansas's statute was much more restrictive.

On April 4, 2001, the trial court entered an order granting Nancy's petition for visitation. Pursuant to the court's order, Nancy was granted visitation with Ali and Seth once a month for a twenty-four-hour period. Greg did not appeal this order.

On May 8, 2002, Greg filed a petition seeking to terminate Nancy's grandparent visitation. Therein, he alleged that this court's decision in two recent cases rendered the Arkansas GPVA

unconstitutional and asserted that those decisions constituted a change in circumstances warranting termination. Greg also averred that visitation was no longer in the best interests of his children due to a change in personal circumstances. In response, Nancy filed a motion for partial summary judgment, arguing that Greg was barred from relitigating the issue of the GPVA's constitutionality because he failed to appeal the trial court's previous order finding the statute constitutional. Nancy's motion was granted on November 25, 2002.

The trial court then held a hearing on December 11, 2002, to determine if there had been a change in circumstances that warranted a termination of Nancy's visitation. Charlotte Carlson, a licensed professional counselor, testified that she was contacted by Gretchen and Greg Hunt in June 2000, about concerns over the blending of their two families. Carlson testified that she was present in the Hunt's home during Nancy's first court-ordered visitation. According to Carlson, Nancy refused to shake her hand or even make eye contact with her. Carlson further testified that since the visits with Nancy began, she has noticed behavioral changes in both Ali and Seth. Specifically, she noted that Ali was difficult to separate from her parents, probably due to the child having abandonment issues. During one visit with Carlson, Ali spontaneously stated that she did not want to visit her grandmother anymore. Carlson stated that Ali complained about her grandmother forcing her to watch videos and look at pictures of her mother, Karen. Carlson also said that Seth once said, "I just want to rip her head off." When Carlson asked Seth who he was talking about he replied, "Grandma, grandmother's." Despite the behavioral changes in the children, Carlson stated that she had never recommended terminating visitation with Nancy, but that she did believe some kind of change needed to be made. On cross-examination, Carlson stated that she would recommend that the grandparent visitation occur under parental control, specifically that Nancy should participate in family activities.

Greg testified at that hearing that since his children had been visiting Nancy, he has noticed a change in their demeanor. Specifically, he testified that when Ali and Seth return from a visit, it takes them a couple of days to open up again. He stated that he had noticed problems with Ali and her schoolwork. Greg also stated that since the visitation started, Seth breaks out in hives over his entire body. According to Greg, the court-ordered visits also interfere with the way that he and Gretchen are trying to raise all of their children.

Also testifying was Jennifer Hawkins, a teacher at the Plainview-Dover School. Hawkins stated that she taught Ali during the past school year. At the beginning of the year, Hawkins gave the students an assignment to express what makes them happy and what makes them unhappy. According to Hawkins, Ali stated that what makes her happy "is not going to my grandmother's house" and what makes her unhappy "is going to my grandmother's house."

Finally, Dr. Steven Shry, a clinical psychologist, testified that he had evaluated Ali and Seth in connection with this case. He stated that nothing about the tests he conducted or his personal interaction with the children led him to believe that they had a problem visiting their grandmother.

At the conclusion of the testimony, the trial court ruled from the bench that the petition to terminate would be denied. He noted that the biggest change in circumstances since visitation was ordered was the fact that Greg and Gretchen had consolidated their families through the adoption process, but that such change was not significant enough to warrant modification of the visitation. The court recognized that there was evidence of some behavioral problems with the children, but stated that it was not possible to determine whether those problems stemmed from the visitation with Nancy or the blending of Greg's and Gretchen's families. The trial court concluded that there were no material and significant changes in circumstances to warrant termination or modification of the previous order.

The trial court subsequently entered two orders on December 26, 2002. In the first order, the trial court ruled that the previous order determining that the GPVA was constitutional was *res judicata* and, thus, Greg was barred from relitigating that same issue. In the second order, the trial court held that there were no material changes that warranted termination of Nancy's visitation rights. Greg filed a motion for reconsideration and new trial on January 6, 2003, arguing that the trial court erred in ruling that *res judicata* barred him from relitigating the issue of the constitutionality of the statute. The trial court denied his motion on January 13, 2003. This appeal followed.

For his first point on appeal, Greg argues that the trial court erred in ruling that his argument that the GPVA is unconstitutional was barred by the doctrine of *res judicata*. In support of this argument, Greg points out that this court had not yet handed

down either *Linder*, 348 Ark. 322, 72 S.W.3d 841, or *Seagrave*, 349 Ark. 433, 79 S.W.3d 339, and, thus, he did not have the benefit of the constitutional analysis enunciated in those cases.[2] Nancy argues that the trial court was correct in its ruling, as all of the elements of *res judicata* are satisfied in this case. We agree that *res judicata* applies in this case.

 *Res judicata* means a thing or matter that has been definitely and finally settled and determined on its merits by the decision of a court of competent jurisdiction. *Crooked Creek, III, Inc. v. City of Greenwood*, 352 Ark. 465, 101 S.W.3d 829 (2003); *JeToCo Corp. v. Hailey Sales Co.*, 268 Ark. 340, 596 S.W.2d 703 (1980). The doctrine of *res judicata* bars the relitigation of claims that were actually litigated in the first suit, as well as those that could have been litigated. *Linder*, 348 Ark. 322, 72 S.W.3d 841; *State Office of Child Support Enforcem't v. Willis*, 347 Ark. 6, 59 S.W.3d 438 (2001). The underlying policy of *res judicata* is to prevent parties from relitigating issues or raising new issues when they have already been given a fair trial. *Id.*

 In *Linder*, 348 Ark. 322, 72 S.W.3d 841, this court noted that the application of *res judicata* in the context of custody cases is somewhat different and stated:

> Custody matters, however, are different when the doctrine of *res judicata* is called into play. When the matter is a custody issue, our court takes a more flexible approach to *res judicata*. We recognize, for example, that custody orders are subject to modification in order to respond to changed circumstances and the best interest of the child. *Mood v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999); *Thurston v. Pinkstaff*, 292 Ark. 385, 730 S.W.2d 239 (1987). For example, in *Tucker v. Tucker*, 195 Ark. 632, 636, 113 S.W.2d 508, 508 (1938), we said:
>
>> The judgment of a chancery court in this state, awarding the custody of an infant child to one of the parents, or to any other person, is a final judgment, from which an appeal lies, but it is not res judicata in the same or another court of this state

---

[2] Greg spends much of his brief emphasizing the fact that the Supreme Court vacated and remanded an Arizona court order granting grandparent visitation in *Dodge v. Graville*, 533 U.S. 945 (2001). The fact that the Court vacated the Arizona case is, however, of no import in the present case.

involving the custody of the same child, where it is shown that the conditions under which the former decree was made have changed and that the best interest of said child demand a reconsideration of said order or decree.

*Id.* at 339-40, 72 S.W.3d at 850.

Greg argues that this court's recent decisions invalidating the GPVA constitute a change in conditions that precludes the application of *res judicata*, as envisioned by this court in *Linder*. Nancy counters that the trial court correctly relied on this court's decision in *Boyles v. Boyles*, 268 Ark. 120, 594 S.W.2d 17 (1980), in determining that *res judicata* barred relitigation of the issue of the constitutionality of the GPVA. Thus, we begin our analysis of this issue with *Boyles*.

In *Boyles*, this court was faced with the issue of whether a decree awarding alimony that was based on a statute, later declared to be unconstitutional, could be reversed. In that case, the appellant never challenged the constitutionality of a statute that granted alimony only to a wife and not to a husband. The appellant only raised his challenge after the United States Supreme Court declared a similar statute unconstitutional in *Orr v. Orr*, 440 U.S. 268 (1979). The trial court agreed with the appellant that the alimony statute was unconstitutional, but held that the original order awarding alimony remained valid because of the appellant's failure to challenge the constitutionality prior to the time the order was entered.

On appeal, the appellant argued that *res judicata* was not applicable because alimony is a continuous payment that is always subject to modification because of changed circumstances. This court noted that "where a judgment is based upon rights conferred by a statute later declared unconstitutional, the doctrine of res judicata bars the relitigation of the case in which it was rendered, or the reopening of the judgment after it has become final." *Boyles*, 268 Ark. at 123, 594 S.W.2d at 19 (citing *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371 (1940)). This court agreed that an award of alimony could be subject to review, but only if there were changes in the circumstances of the parties. The court then concluded that a decree for alimony was *res judicata* on the circumstances prevailing at the time of the decree. Further, in rejecting the appellant's argument, this court also noted that it

would be inequitable to strike the provision for alimony where such an allowance was only one factor in the division of the marital estate.

Relying on our decision in *Boyles*, the trial court granted Nancy's partial summary-judgment motion, stating:

> 2. The current proceeding in the above styled case involves the same parties who litigated the previous action and involves the same legal issue, namely, the constitutionality of the Arkansas Grandparents Visitation Act.

> 3. Pursuant to the precedents handed down by the Arkansas Supreme Court in the cases of *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002), and *Boyles v. Boyles*, 268 Ark. 120, 594 S.W.2d 17 (1980) the issue of the constitutionality of the Arkansas Grandparents Visitation Act is res judicata and Plaintiff's Motion for Partial Summary Judgment should be granted.

Although *Boyles* is instructive generally on the issue of the effect of a statute being declared unconstitutional, no Arkansas court has addressed the specific issue of whether a change in the law constitutes a change in circumstances warranting modification of a visitation order. It appears that other jurisdictions have addressed such an issue and reached differing results.

In *Ingram v. Knippers*, 72 P.3d 17 (Okla. 2003), the Supreme Court of Oklahoma stated that a party who had agreed to an order granting a grandfather visitation rights could not collaterally attack that order by arguing that the State's grandparent-visitation statute was unconstitutional; rather, the mother was required to show a change in circumstances. In reaching this conclusion, the Oklahoma court stated:

> Even if the grant of grandparental visitation had been pursuant to title 10, section 5, the order is not subject to collateral attack on the grounds that section 5 was declared unconstitutional. A judgment based on a statute which is later declared unconstitutional "is not void so as to be subject to collateral attack" but at most voidable and subject only to direct attack. *Fitzsimmons v. City of Oklahoma City*, 1942 OK 422, ¶ 8, 135 P.2d 340, 343. Applying this rule, a grant of grandparental visitation made under the authority of

section 5 is "voidable and subject to direct attack, but it [is] not void so as to be subject to a collateral attack." *Fitzsimmons*, 1942 OK 422 at ¶ 8, 135 P.2d at 343.

*Id.* at 21. The Oklahoma court further discussed the requirement that a party must show a change of circumstances in order to modify a visitation order. While the court did not specifically address the issue of whether a change in the law constituted a change in circumstances, it can be inferred from the decision that the court required a change in personal circumstances. Specifically, the court noted that the mother could not relitigate the issue of harm without showing a change in circumstances.

■ Another jurisdiction has specifically addressed this issue and ruled that a change in the law can constitute a change in circumstances. *See In the Interest of T.J.K.,* 62 S.W.3d 830 (Tex. Ct. App. 2001). In T.J.K., the Court of Appeals of Texas reversed a lower court's order finding that a father's reliance on the Supreme Court's decision in *Troxel* did not establish sufficient grounds to modify a previous order granting grandparent visitation. In that case, there had been an agreed order of visitation, but following the decision in *Troxel*, the father sought to terminate the grandparent visitation, asserting that there was no longer any basis in law for the grandmother to access the child. The grandmother countered that the father waived his constitutional argument when he consented to the agreed order of visitation. The court of appeals stated that there was no waiver, because it was a case in which the trial court retained continuing jurisdiction and had the right to alter the visitation order. In concluding that the father had the right to challenge Texas's grandparent-visitation act, the court stated:

> Sam has no less a right to seek modification of the order because a statute is found unconstitutional than because of a change of fact. If a statute that authorized a term or condition of visitation is declared unconstitutional, that change should operate like any other change in circumstances that potentially makes the order unworkable or inappropriate. There is nothing in the statute that limits that change in circumstances to factual changes rather than changes in law.

*Id.* at 832.

■ In reaching its conclusion, the Texas court did not address the doctrine of *res judicata* or its effect in custody cases. Thus, we are more persuaded by the rationale of the Oklahoma Supreme Court that a change of circumstances that prevents the application of *res judicata* is a change in the circumstances of the parties, not the law.

■ Here, we have a court order that was issued after *Troxel* declared the Washington grandparent-visitation statute unconstitutional. Greg raised a challenge to the Arkansas GPVA based on that decision in *Troxel*. When he did not prevail on that issue, he failed to appeal it to this court. If he had appealed, he may well have prevailed as the parent did in *Linder*, however, the fact that he failed to pursue an appeal now prevents him from challenging the trial court's previous order finding the statute constitutional. In sum, because we have a case that involves the same parties, the same issue, and has already been decided by a court of competent jurisdiction, the doctrine of *res judicata* is applicable. Accordingly, we cannot say that the trial court erred on this point.

For his second point on appeal, Greg argues that the trial court erred in denying his motion for reconsideration or new trial because his argument that the GPVA is unconstitutional on its face is not barred by the doctrine of *res judicata*, as it was neither raised nor ruled upon in the prior litigation. Specifically, Greg relies on a footnote in this court's opinion in *Seagrave*, 349 Ark. 433, 79 S.W.3d 339, wherein we noted that all of the GPVA, except the subsection that allows visitation when no parent has custody, had been declared unconstitutional. Greg argues that the whole act must be stricken, despite the one section that this court ruled was unconstitutional, because the purpose of the act is to accomplish a single object. We disagree.

■■ In raising this argument, Greg ignores a well-settled principle of the *res judicata* doctrine, namely that it includes issues that could have been raised in the first litigation. *See, e.g., Arkansas La. Gas Co. v. Taylor*, 314 Ark. 62, 858 S.W.2d 88 (1993); *Talbot v. Jansen*, 294 Ark. 537, 744 S.W.2d 723 (1988). In this case, when Nancy first filed her petition for visitation, Greg sought summary judgment, arguing that the GPVA was unconstitutional because it violated his rights under the Fourteenth Amendment's Due Process Clause. In making this argument, he relied heavily on the Supreme Court's decision in *Troxel*. The trial court subsequently

ruled that the GPVA was constitutional, noting that it was more restrictive than the Washington statute and that it created a presumption that a court will give due consideration to a parent's decision regarding visitation. In sum, the court's order made no distinction as to whether the statute was constitutional on its face or as applied to Greg's case, despite the fact that Greg was free to argue that the GPVA was unconstitutional on its face. Thus, *res judicata* bars Greg from now attacking the GPVA as unconstitutional on its face.

For his third point on appeal, Greg argues that the trial court erred in refusing to terminate Nancy's visitation in this case because the evidence demonstrated that a change in circumstances warranted such termination. According to Greg, there have been two specific changes in circumstances: (1) the change in the constitutional landscape following this court's decisions in *Linder*, 348 Ark. 322, 72 S.W.3d 841, and *Seagrave*, 349 Ark. 433, 79 S.W.3d 339; and (2) changes in his children's behavior since visitation was ordered. We do not agree that there was sufficient evidence warranting termination of visitation.

We again reiterate that Greg's argument that the legal changes to the GPVA following our decisions in *Linder* and *Seagrave* are not the type of changed circumstances that warrant modification of the visitation order. With that said, we must now determine whether there were material changes in circumstances that warranted termination of Nancy's visitation.

In reviewing chancery cases, we consider the evidence *de novo*, but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999); *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997). This deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Hamilton*, 337 Ark. 460, 989 S.W.2d 520.

■ With this standard in mind, we turn to the evidence presented regarding the children since they began the court-ordered visitation. Charlotte Carlson, a licensed counselor who had been working with the Hunt family, testified about behavioral changes that she noted in the children since the visitation began, specifically that they seemed to have abandonment issues. She also testified about negative statements each child had made regarding their grandmother and their visits with her. Despite this, Carlson admitted that she had never recommended terminating Nancy's visitation. Moreover, Dr. Steven Shry stated that any behavioral problems exhibited by the children could be the result of either the blending of Greg's and Gretchen's families or the visitation, or both. Moreover, Dr. Shry testified that none of the tests he conducted indicated that either child had a problem with visiting their grandmother. The trial court took all this testimony into consideration and concluded that there were no material changes warranting termination of the visitation order. Deferring to his superior position to evaluate the testimony and consider the best interests of the children, we cannot say that he erred on this point.

Affirmed.