Greg HUNT *v.* Nancy PERRY

03-1014 162 S.W.3d 891

Supreme Court of Arkansas
Opinion delivered April 29, 2004

---

228

*Joel W. Price*, for appellant.

*Peel Law Firm, P.A.*, by: *John R. Peel* and *Jennifer L. Modersohn*, for appellee.

ROBERT L. BROWN, Justice. This is a second and subsequent appeal of a case involving grandparent visitation ordered in favor of appellee Nancy Perry, as the maternal grandmother of two grandchildren, Ali and Seth. In the first *Hunt* decision, we held that appellant Greg Hunt's claim that the Arkansas Grandparent Visitation Act was unconstitutional was barred by the doctrine of *res judicata. See Hunt v. Perry*, 355 Ark. 303, 138 S.W.3d 656 (2003) (*Hunt I*). We further held in *Hunt I* that Greg Hunt's claim that legal changes to the Act, following decisions by this court, did not constitute the type of changed circumstances warranting modification or termination of visitation.

Greg Hunt now appeals from the circuit court's order finding him in contempt of court for denying Nancy Perry visitation as was previously ordered by the court and denying yet another motion by him to terminate grandparent visitation. He raises three points on appeal. We affirm the circuit court.

·A detailed statement of the facts regarding the relationship and litigation between the parties is set forth in *Hunt I.* For purposes of the present appeal, suffice it to say that following the circuit court's visitation order of April 4, 2001, which this court affirmed in *Hunt I*, Perry filed a petition for citation for contempt and to show cause against Hunt for failing to allow her visitation with her grandchildren on March 26, 2003. The circuit court granted Perry's petition and ordered Hunt to appear on May 6, 2003, to show cause why he should not be held in contempt.

On April 8, 2003, Hunt filed a motion for an emergency order to terminate grandparent visitation. In the motion, Hunt asserted that his minor child, Seth, who was age five at the time, had made certain disclosures indicating that Perry had sexually abused him. Hunt stated his intent to suspend the children's visitation with Perry and acknowledged that his actions would conflict with the court's visitation order. He asserted, however, that the best interest of the children necessitated this action until the court could set the matter down for a hearing.

On April 15, 2003, Perry filed a second motion requesting that Hunt be held in contempt and asserting that Hunt had

expressed his intent not to comply with her April 18, 2003 visit with the children. She contended in this motion that his attempts to excuse his misconduct were unfounded due to the Arkansas State Police's review of the sexual-abuse allegations against her and its determination that the allegations were unsubstantiated.

On April 22, 2003, Perry filed another petition for a contempt citation in which she stated that Hunt failed to allow visitation on April 18, 2003. She requested that the court order him to show cause why he should not be held in contempt of court. Hunt again responded that his actions were taken in the best interest of his children and mounted the additional defense that the Arkansas Grandparent Visitation Act was unconstitutional on its face and as applied and that the current order in his case granting grandparent visitation was void *ab initio*.

Following a hearing on May 6-7, 2003, on Perry's two motions for contempt and Hunt's motion to terminate grandparent visitation, the circuit court issued its order on May 22, 2003. In that order, the court denied Hunt's motion to terminate grandparent visitation and found him in contempt of court for his denial of Perry's visitation with the children. The court further ordered Hunt to pay a contempt fee of $1000 to Perry's counsel and granted Perry a "makeup" visitation with the children by extending her visitation in May and July of 2003. The court also ordered Hunt and his current wife, Gretchen Hunt, who is the stepmother of the children at issue, to undergo individual and family counseling by a court-approved psychologist or psychiatrist, with costs to be borne by Hunt.[1]

## I. Contempt

Hunt first urges that because the constitutional landscape regarding the Arkansas Grandparent Visitation Act has changed since the issuance of the order on April 4, 2001, which allowed Perry's visitation, a material change in circumstances has occurred. Hunt submits that because Perry's rights were never vested under the unconstitutional statute, the statute is void from the date of its

---

[1] The record reflects that further pleadings were filed in this matter, including a June 19, 2003 motion to suspend Perry's visitation and for an emergency order to terminate grandparent visitation. However, these pleadings were filed after the May 22, 2003 order from which Hunt appeals, and they address new matters. For that reason, they are not pertinent to this appeal.

enactment. For that reason, he contends that his due-process rights are violated each time he is forced to comply with the unconstitutional order. He claims that he was making a legitimate challenge to the validity of an order rendered unconstitutional by decisions of both the United States Supreme Court and this court. In short, he contends that his actions cannot be the subject of contempt.

■ We conclude that the contempt involved here is civil contempt, which compels compliance with the court's order for the benefit of private parties. *See Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 156 S.W.3d 228 (2004). The standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *See id.* In the instant case, Hunt urges that he should not have been found in contempt, because the underlying visitation order was made prior to this court's decisions that the Grandparent Visitation Act is unconstitutional. For that reason, he contends he should not have to comply with it. In making this argument, Hunt relies on our decisions in *Seagrave v. Price*, 349 Ark. 433, 79 S.W.3d 339 (2002), and *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002).

■ In *Johnson v. Johnson*, 343 Ark. 186, 33 S.W.3d 492 (2000), this court observed that where a person is held in contempt for failure or refusal to abide by a court's order, the reviewing court does not look behind the order to determine whether it is valid. We said:

> . . . The fact that a decree or order is erroneous does not excuse disobedience on the part of those who were bound by its terms until reversed. *Carle*, 311 Ark. at 480, 845 S.W.2d at 9 (quoting *Meeks v. State*, 80 Ark. 579, 98 S.W. 378 (1906)). However, if the contemnor was making a legitimate and successful challenge to the *validity* of the order, we may look beneath the order and recognize substantive error as a defense to contempt. *Id. On the other hand, if the contemnor merely refused to comply with an order that was clearly within the judge's jurisdiction and power, we will not look behind that order. Carle*, 311 Ark. at 481-82, 845 S.W.2d at 10. . . .

343 Ark. at 197, 33 S.W.3d at 498-99 (emphasis added).

■ While Hunt asserts that the underlying visitation order was unconstitutional and, thus invalid, it was certainly valid at the time it was issued and within the subject-matter jurisdiction of the circuit court. Moreover, as we said in *Hunt I*, Hunt failed to appeal

the rejection of his constitutional challenge to the Arkansas statute upon which the visitation order was based, and any subsequent argument along those same lines is barred by *res judicata*. Because he refused to comply with an order that was clearly within the circuit court's jurisdiction and because this court will not look behind the order for contempt purposes, we hold that Hunt has not demonstrated that the circuit court's finding of contempt against him was in error.

## II. Best Interest of the Child

Hunt argues next that there was substantial evidence that his son, Seth, was being sexually abused by Perry and for that reason, he was justified in refusing to comply with the court's visitation order. He relies on our court of appeals' decision in *Wakefield v. Wakefield*, 64 Ark. App. 147, 984 S.W.2d 32 (1998), for the proposition that where a parent is acting in reliance on the advice of professionals, he or she is not in willful contempt of court, even where the actions have the effect of temporarily denying a parent visitation rights.

In *Wakefield v. Wakefield, supra*, the court of appeals reversed a finding of contempt against the mother who faced a similar situation with suspicions of child abuse. In that case, the mother grew concerned about her almost three-year old daughter's behavior. She sought counseling for the child and the counselor arranged a meeting with the child's father to inform him of the suspicions which suggested sexual abuse by the paternal grandfather. The counselor further reported her suspicions to the Arkansas Department of Human Services, which conducted a physical examination of the child at Arkansas Children's Hospital. That examination yielded no physical signs of sexual abuse.

DHS suggested to the mother, however, that an alternate plan for visitation be established, such as supervised visitation. The mother also testified that DHS told her that if she knowingly exposed her children to potential sexual abuse, she risked loss of custody. When the children's father rejected supervised visitation, the mother "felt she had no choice but to deny visitation." 64 Ark. App. at 150, 984 S.W.2d at 33. She filed a motion to restrict visitation to a location away from the father's residence with the paternal grandfather, while the investigation was pending. The child's father then filed a motion for contempt charges against the mother for denying unrestricted visitation on two occasions. After

a hearing on the motions, the trial court found no basis for the appellant mother's contentions and found her in contempt for denying visitation on those two occasions. She was ordered to pay $500 in attorney's fees to the father's attorney, which was suspended on condition that she comply with the orders previously entered by the court.

Following the court's order, the child was admitted to a health facility because the counselor believed she was nearing a psychotic breakdown. The original judge in the case then recused and the next day, the father of the child filed a petition for change of custody and another petition for contempt. In response, the mother filed a petition for an order of protection, as well as other petitions. After a hearing, the trial court dismissed all of the mother's petitions, "stating that the testimony was speculative and tenuous and that no witness had confirmed any sexual abuse." *Id.* at 153, 984 S.W.2d at 35. The court revoked the suspension of the mother's prior sentence for contempt, awarded the paternal grandfather partial attorney's fees, and required the mother to seek court approval prior to pursuing what it found were speculative, spurious, and totally false claims of sexual abuse. At the conclusion of a review hearing, the trial court ordered that the mother was not to seek psychiatric treatment for the children without approval from DHS and that she was to pay $4,550 in expert fees and $1,000 in attorney's fees.

On appeal, the court of appeals reversed the contempt order and said:

> We do not agree with the chancellor that appellant should be found in willful contempt, and we find his order to be arbitrary and against the weight of the evidence. The evidence does not reflect that the appellant's fears were completely unfounded. Although he did not find any evidence of sexual abuse, the judge himself noted that the mother was doing what she thought was best for her children. Further, it was a medical doctor who ordered that the child be admitted and supervised in a hospital, and we do not believe that appellant was unreasonable in obeying the doctor's order. In fact, as noted, sexual abuse was not completely ruled out by the experts. And appellant's expert witnesses stated that although there was no physical evidence of sexual abuse, they saw signs of sexual abuse.
>
> Even the appellees' expert witness did not preclude the possibility that [H] had been subjected to sexual abuse. Moreover, she stated that it would not be abnormal for a mother to be overly

worried when she had been told by two experts that there was a very good possibility that her daughter had been sexually abused. Based upon the testimony presented, there was evidence from which appellant could have reasonably concluded that her daughter might have been sexually abused by her grandfather. Under these circumstances, we cannot say that a mother who is legitimately concerned about the welfare of her child and has acted upon the advice of DHS and qualified professionals is in willful contempt of court.

*Id.* at 155, 984 S.W.2d at 36 (footnote omitted).

The dissent in *Wakefield* cited to this court's prior statements that where there are conflicts in testimony, it is the duty of the appellate court to give the same force to findings of the trial court in contempt proceedings as in other cases when the testimony is conflicting, and every presumption must be indulged in favor of the trial court's judgment. *See Dennison v. Mobley*, 257 Ark. 216, 515 S.W.2d 215 (1974).

In the instant case, Perry testified that upon arriving at the Hunts' home for her March 2003 visit with the children, no one was home. She further testified that prior to the April 2003 scheduled visit, she cooperated with the Arkansas State Police regarding allegations against her involving her grandson, Seth. Terry Ward, a supervisor with the civilian unit of the Arkansas State Police, testified that the final conclusion reached in Perry's case was that a preponderance of the evidence did not show that Seth had been sexually abused by Perry.

Steve Shry, a licensed psychologist, testified on behalf of Perry that he examined both of the Hunt children, Ali and Seth, on five occasions in late 2002. At that time, Dr. Shry stated that Seth evidenced no sexual curiosities that were unusual for his age; nor did Hunt describe his son to Dr. Shry as anything but "perfectly normal." Dr. Shry testified that his evaluation of Perry revealed no indication that she might be a sexual predator. He stated that after reviewing the Arkansas State Police report and information from the Arkansas Department of Human Services, it appeared to him that Seth had been coached regarding the allegations of sexual abuse. He further took issue with the actions of the Hunts' counselor, Charlotte Carlson, in asking Seth questions in the

presence of his parents who had made the allegations.[2] He also cited concerns over the fact that Hunt's current wife, Gretchen, had made similar accusations against her ex-husband in a petition to terminate his parental rights. Dr. Shry, finally, pointed to what he believed were inconsistencies in Seth's discussions with Carlson.

Greg Hunt testified that he was purposely gone the evening of the March 2003 visit in order to protect his son. He stated that the court's visitation order was clear, and he admitted that he did not file an emergency motion to terminate visitation prior to the March 2003 visit. He also admitted that his attorney received a letter for him dated April 4, 2003, from the Arkansas State Police investigator telling him that the allegations of sexual abuse against Perry were found to be unsubstantiated. He then testified that on April 8, 2003, after receiving the investigator's letter, he filed a motion for emergency order for terminating grandparent visitation. Upon questioning by his counsel, Hunt stated that he did not receive any notification from the Arkansas State Police until April 15, 2003. He later stated that while the letter was postmarked April 15, 2003, he did not receive it until April 16, 2003. Upon recall, Hunt testified that he also kept his daughter from visitation with Perry because of what was going on with his son.

Hunt's expert, Dr. Glenn Lowitz, a clinical psychologist, testified that he saw Seth only one time. He said he made it clear to the Hunts that he could not form any final conclusions about Seth after just one meeting. He told the court how Hunt's son told him that "Nanny," his name for Perry, did "gross things" to him. When questioned, Seth gestured to his pelvic area without using words. He also told Dr. Lowitz that she "touches [him] on the booty," that she "touched his pee pee with her finger," and that "[s]he put her finger inside of it where my poop goes out." Dr. Lowitz concluded by saying that he saw an "eyebrow raising concern" with Hunt's son and saw a "significant problem" with the family.

 There is no doubt that Hunt violated the court's visitation order by denying Perry visitation with each grandchild for two months. As already related, in *Wakefield*, the court of

---

[2] The reports of Charlotte Carlson, a licensed professional counselor, were submitted in support of Hunt's motion to terminate visitation. Although she did not testify before the court, both parties' experts reviewed her reports.

appeals reversed a finding of contempt against the appellant mother. It did so, however, on the basis that not only was the mother legitimately concerned for the welfare of her child, but she was acting on the advice of DHS officials and a medical doctor. Here, Hunt testified that he willfully, and of his own accord, withheld visitation. That circumstance distinguishes the instant case from *Wakefield*.

██ It is well established that willful disobedience of a valid court order is contemptuous behavior. *See Omni Holding & Dev. Corp. v. 3D.S.A., Inc., supra.* In addition, we are mindful of the reasoning of the dissent in *Wakefield*:

> I am not unsympathetic to a parent's interest in protecting his or her child from what is perceived to be a potentially dangerous situation. However, in my view, if a parent willfully disregards a court order regarding visitation, and does so without any effort to obtain emergency relief from the appropriate chancery court, the parent proceeds at his or her peril. If the evidence adduced at a subsequent hearing reveals to the satisfaction of the chancellor that the child's safety would not have been compromised, then the intentional failure to allow visitation is without justification and an order of willful contempt is the proper sanction. I submit that this is exactly what occurred in this case.

64 Ark. App. at 157, 984 S.W.2d at 37 (Robbins, C.J., dissenting). The circuit court in the instant case specifically denied Hunt's motion to terminate visitation and concluded that he was in contempt of court for violating the court's visitation order. Where there are conflicts in testimony, such as when Hunt received the state police report, it is this court's duty to give the same force to the findings of the circuit court in contempt matters as in any other case. *See Dennison v. Mobley, supra.* We cannot say that the circuit court's order was clearly against the preponderance of the evidence.

We are further of the view that the circuit court's order that the Hunts undergo individual and family counseling with Dr. Glen Lowitz (the Hunts' psychologist) or another court-approved psychologist with Perry in attendance is a decided plus. This, we believe, illustrates the circuit court's commitment to finding a longterm solution to this case.

### III. Material Change of Circumstances

Hunt's final argument is that he sufficiently demonstrated two changes justifying termination of Perry's visitation rights: (1) the change in the constitutional landscape of the Grandparent Visitation Act since entry of the court's visitation order based on *Seagrave* and *Linder*; and (2) proof of sexual abuse by Perry. He also maintains that the circuit court erroneously relied upon the Arkansas State Police investigation and report which were improperly admitted into evidence. Perry was not charged, but he asserts that the report and the investigation were conducted looking toward the standard of proof of beyond a reasonable doubt, whereas all he needed to prove for a material change of circumstances is that sexual abuse occurred by a preponderance of the evidence. He further takes issue with the fact that the trial court permitted Terry Ward to testify in the place of Renae Tisdale, who was the investigator for the State Police.

██ ██ This court has previously rejected Hunt's argument that a change in circumstances warranting a modification of visitation occurred due to the change in legal viability of the grandparent-visitation statute following the *Seagrave* and *Linder* decisions. In *Hunt I*, this court observed:

> We again reiterate that Greg's argument that the legal changes to the GPVA following our decisions in *Linder* and *Seagrave* are not the type of changed circumstances that warrant modification of the visitation order.

355 Ark. at 315, 138 S.W.3d at 663. Accordingly, this point has already been decided.

With regard to the allegations of Perry's sexual abuse of Seth, this court applied the following standard for reviewing Hunt's claims of a change in circumstances in *Hunt I*:

> In reviewing chancery cases, we consider the evidence *de novo*, but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999); *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997). This deference to the trial court is even greater

in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Hamilton*, 337 Ark. 460, 989 S.W.2d 520.

355 Ark. at 315, 138 S.W.3d at 663.

Using this standard and evaluating the testimony, we cannot say that the circuit court's findings were clearly erroneous. Prior to the entry of its order, the circuit court ruled orally from the bench and said:

> I can't believe that Ms. Perry would fight as hard as she's fought for as long as she has fight — and has fought to this point and two months later engage in sexual misconduct with these children. I simply find that to be highly incredible, especially given Dr. Shry's testimony, the examinations that were made; the MMPI's done, examination of her and the children some two months before. If somebody had such sexual deviants I — in their personality I think that that would have clearly been revealed and to say that it suddenly surfaced in two or three months, I simply don't find to be very credible.

> I think that Dr. Lowitz as well, and his testimony was, that he really hadn't examined the child enough to — to come to any sort of opinion, you know, I can — I can mitigate a little bit the March denial, but April I can't. We had the report of the state police. They simply say it's unsubstantiated and at that point we deny it and, then, even after denial wait to go see an expert to try [to] find something else.

> Every time we come up with something, something else is thrown up to deny the visitation. So, I can — I can grant some leeway on the March, but I can't on the April. I just don't find that that's in good faith at all.

> We have no allegations as to the female child whatsoever and I can't find that it's in good faith on either month in that regard.

> You know, I think some of the testimony that was there that influenced the court was simply that, you know, that Dr. Lowitz's testimony is that the efforts of Mr. and Mrs. Hunt are — are designed towards uniting their family and that to the exclusion of Ms. Perry and — and others that they see are thwarting their efforts to unite these five as a group.

You know, this — this young child, everybody knows, we brought him in yesterday and for a five-year old there's no way that I can allow him to testify. I don't think he's near competent enough to do that in a court of law. When asked what would happen if he didn't tell the truth in court he said I would spank him, you know, granted he may get spankings at home, but that's — doesn't show any near comprehension of the seriousness of what we're here for. So, I don't think that we — we needed to hear from him. . . .

 It is obvious that the weight given to most of the testimony presented to the circuit court turned on the credibility of the witnesses. Again, this court gives due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *See Hunt I, supra.* This is especially true in custody determinations, as a heavier burden is placed on the circuit judge to utilize his or her powers of perception to the fullest extent in evaluating the witnesses, their testimony, and the best interest of the children. *See Hunt I, supra.* Here, the circuit court evaluated the testimony and made a credibility determination. After our review, we disagree with Hunt that the circuit court's denial of Hunt's petition to terminate grandparent visitation was clearly erroneous.

 As to Hunt's assertions of evidentiary error, this court reviews evidentiary errors under an abuse-of-discretion standard. *See Arkansas Dep't of Human Servs. v. Huff,* 347 Ark. 553, 65 S.W.3d 880 (2002). The circuit court has broad discretion in its evidentiary rulings; hence, the circuit court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion. *See id.* Hunt first challenges the circuit court's admission of testimony regarding the Arkansas State Police report, which was made following the Hunts' call to the sexual abuse hotline. Upon objection to the testimony by Terry Ward regarding the report, the circuit court allowed the testimony:

Here's what we're going to do. I'm — I'm going to let her testify to what's in the report. I have several basis [sic] for that. Number one is she is the supervisor, she's responsible, as she has said, it's part of her job training, duties, additives, expertise is to do this. It's a normal function of her office in the department of the state police of which she is employed. So, I think she's qualified to do that. She does it on a regular basis.

As well I think this is — falls, to some extent, under the exception of [the] hearsay rule of records of regularly conducted

business activity, although the state police is not a business, they — this particular unit is in the area of investigating these crimes and these are allegations of crimes and this is how they normally go about it and these are the reports generated in the normal course of those investigations and, then, reviewed and — by the supervisor with that authority she has done that and it would be admissible on that basis, as well.

So, I'm going to let her testify. . . .

Regarding the circuit court's second reason, Arkansas Rule of Evidence 803(8) permits the admission of public records and reports as exceptions to the hearsay rule, even when the declarant is available as a witness. The same subsection, however, specifically provides that neither police investigative reports nor factual findings resulting from a special investigation of a particular complaint are within the public records exception to the hearsay rule. The question then is whether the circuit court erred in receiving into evidence Renae Tisdale's investigative report through the testimony of her supervisor, Terry Ward. Certainly, the report itself would not pass muster for admissibility under the rule.

Despite Rule 803(8), the circuit court also allowed Ms. Ward to testify about the Tisdale report for a second reason — her supervisory status. In *Hess v. Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985), we said that the circuit court has considerable latitude under Ark. R. Evid. 803(24) to admit evidence that the court feels meets the spirit of the rule. Here, Ms. Ward testified that she was Ms. Tisdale's supervisor and that in her capacity as supervisor, she assigns investigative projects to staff and then reviews their work once it is completed. She stated that she "review[s] the interviews, the summary of the interviews that [the investigator's] done and any other pertinent information that she obtains during the investigation prior to reaching a determination on the case." We note that Hunt had the opportunity to cross-examine Ms. Ward and did so. We further note that the circuit court only alluded to the state police's *conclusion* that the allegations were unsubstantiated in its oral findings at the end of the hearing. It did not refer to the investigation itself. Testifying to a report's conclusion over which Ms. Ward was integrally involved and has supervisory control does not run afoul of our hearsay rule. For this

reason, we hold that the circuit court's admission of the testimony regarding the report did not constitute reversible error.

 As to Hunt's claim that the circuit court erred in not ordering Ms. Tisdale to appear in court, a review of the record reveals that Perry's counsel informed the court of Ms. Tisdale's absence due to the fact that she had previously received a subpoena for another hearing that same day. Perry's counsel then told the court that Ms. Ward had come in place of Ms. Tisdale. At the time counsel informed the court of this, counsel for Hunt did not object to Ms. Tisdale's absence. This court has routinely held that an appellant must object at the first opportunity to preserve the matter for appeal. *See Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). Because he failed to do so, this matter is not preserved for our review. *See id.*

Affirmed.

CORBIN and THORNTON, JJ., concur.

DONALD L. CORBIN, Justice, concurring. I agree with the decision to affirm the trial court's order in this case, but I would modify the judgment to require that the grandmother's visitation be supervised until such time that the child's allegations may be fully investigated. Cases like the one now before us present a serious dilemma. On the one hand, we must protect children from being the victims of sexual predators. It practically goes without saying that children who are the victims of sexual abuse will carry the scars of abuse with them for the rest of their lives. As a parent and a judge, I want to do everything in my power to protect these children.

On the other hand, we must also protect the dignity of our legal system and the reputations of those persons falsely accused of sexual crimes by exposing false accusers and preventing them from manipulating the system. Indeed, it is unfortunate that many custody and visitation disputes involve false accusations of child abuse made by those very persons who claim to love the child. Such accusations, even if later shown to be false, can be extremely damaging, both to the person who is falsely accused and to the child who is unwittingly drug through the battle.

While I admit that I am somewhat suspicious of the circumstances in which these sexual allegations have come about, given the litigious history of this case, I believe that the child's safety is of paramount concern. Given the conflicting opinions from the two

psychologists and the certified counselor who interviewed the child, and given that the trial judge took it upon himself to order the Hunt family to participate in both individual and family counseling, I believe it is appropriate to require that the grandmother's visitation be supervised until such time that the child's allegations can be fully investigated. If the child's allegations are substantiated, then visitation should be terminated. If, on the other hand, it turns out that the child was being coached, I believe that the persons responsible must be held accountable for making such damaging allegations. I thus concur in the judgment.

THORNTON, J., joins in this concurrence.